900 So.2d 495 (2005)
Michael Peter FITZPATRICK, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-2759.
Supreme Court of Florida.
January 27, 2005.
As Revised on Denial of Rehearing April 21, 2005.
*503 James Marion Moorman, Public Defender and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles, J. Crist, Jr., Attorney General, Tallahassee, FL and Kimberly Nolen Hopkins, Assistant Attorney General, and Katherine V. Blanco, Senior Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of first-degree murder and sexual battery of Laura Romines, and the corresponding sentences of death for first-degree murder and thirty years' imprisonment for sexual battery. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. For the reasons stated herein, we affirm the conviction of first-degree murder and sentence of death. However, we vacate the sentence for the non-capital offense of sexual battery and remand for resentencing after a guidelines scoresheet has been prepared and considered by the trial judge.

FACTS AND PROCEDURAL HISTORY
The charges against appellant, Michael Peter Fitzpatrick, resulted from the stabbing and sexual battery of Laura Romines, who was found nude and bleeding on the side of a road, and later died from her injuries. Fitzpatrick was tried and found guilty of first-degree murder and involuntary sexual battery with great force. The jury recommended death by a ten-to-two majority. The trial court sentenced Fitzpatrick to death on the charge of murder in the first degree and sentenced him to thirty years imprisonment on the charge of sexual battery to run concurrent with his murder sentence. This direct appeal followed.
The evidence presented at trial indicated that on August 18, 1996, at approximately 3 a.m., several individuals found Romines walking on the side of the road, nude and bloody with her throat slit. When questioned at the scene, and then again at the hospital, Romines gave conflicting responses with regard to who attacked her. At the scene, she separately advised an individual who found her, a paramedic, and the first deputy to arrive that "Steve" had attacked her and that he lived at Water's Edge Apartments.[1] Romines also told the *504 paramedic that "Steve" was a 30-year-old male. The paramedic testified that Romines was in and out of consciousness and possibly did not understand the question when she stated "Steve." Romines also stated that she was stabbed at the location where she was found and that she arrived there in a vehicle. Romines was airlifted to the hospital. At the hospital, detectives Jeff Bousquet and Peter Weekes asked Romines if "Steve" had attacked her and she shook her head no.
Rita Hall, an advanced registered nurse, who was accepted by the trial court as an expert in the field of the examination of sexual assault victims, conducted the SAVE (sexual assault victim examination) on Romines at the hospital. Hall testified that she found a bloody undergarment wrapped around Romines' waist near her breasts, Romines' breasts were deep purple, there was a penetrating wound in the breast area that was either another stab wound or a bite mark, there was puffiness around her head, there was bruising on her arms, her legs were covered in scratches, and there was a cigarette burn on her leg.
Hall also examined and swabbed Romines' vaginal and anal areas. Hall concluded that sexual activity occurred within a fairly close proximity of time, a maximum of an hour or two, from when Romines was found. Hall also concluded that Romines never had the undergarment on after the sexual activity, due to the absence of semen on the undergarment. Hall detected several areas in the vagina and anus that were either a very deep pink or red, indicating there was pressure from something penetrating the areas. In addition, Hall testified that her findings were consistent with forced sexual activity; however, she could not determine conclusively if the sexual activity was forced. Further, the evidence established that the DNA profile developed from Romines' vaginal swabs was consistent with the DNA profile that was developed from Fitzpatrick's blood sample. According to the medical examiner, the cause of death was hemorrhage and aspiration of blood due to incised wounds of the neck, penetrating the larynx and esophagus. The medical examiner could not indicate with any degree of precision the original length of the wound; however, the deepest penetration appeared to be one to one and a half inches.
With regard to Fitzpatrick's involvement with Romines, the evidence established that on August 17, 1996, Romines was dropped off at a 7-Eleven between 7:30 and 8 p.m. Fitzpatrick, who was delivering pizzas for Pro Pizza, saw Romines at the 7-Eleven. In his police statement, Fitzpatrick stated that when he stopped at the 7-Eleven to get gas and cigarettes he saw Romines crying and asked her if she needed a ride to the Sunny Palms Motel. Fitzpatrick stated that he then dropped off Romines at the motel, and later returned to the motel to check on her, but never saw her again. The 7-Eleven surveillance tape from that night revealed that Romines *505 entered the store. The tape also revealed Fitzpatrick at the store.
Two State witnesses, Cindy Young and Jessica Kortepeter, testified that they witnessed a Pro Pizza delivery man arrive at the Sunny Palms Motel with Romines on the night of August 17 between 8:30 and 9 p.m. After Romines informed Kortepeter she was looking for a place to stay, Kortepeter recommended her friend Albert J. Howard. Kortepeter testified that Howard arrived at the Sunny Palms Motel, talked to Romines for about ten to fifteen minutes, and drove off with her at approximately 9 p.m.[2] Young and Kortepeter's testimony was consistent with Howard's, who admitted that he went to the Sunny Palms Motel between 8:30 and 9 p.m. to talk to Romines, and talked to her for fifteen to twenty minutes before she decided to go with him to his house.
The evidence at trial established that Fitzpatrick clocked out with his time card at 11:45 p.m. on August 17, and took a pizza with him. Sally Goodwin, Kortepeter's mother who was visiting Kortepeter at the Sunny Palms Motel, testified that she saw a Pro Pizza truck at the motel that night, but could not remember what time she observed the truck at the motel. Goodwin also testified that she left the motel and drove to Howard's house, where she recalled seeing the same Pro Pizza truck that left the motel. Howard confirmed that a pizza delivery man, whom he identified in court as Fitzpatrick, arrived at his house with a pizza, informed him the pizza was free, and asked him if Romines was there. Howard testified that it was approximately midnight when Romines left with the pizza delivery man "arm in arm."
Howard's testimony was consistent with that of Melanie Yarborough, who was at Howard's house on August 17, 1996. At some point that night, Yarborough observed a Pro Pizza delivery man arrive at Howard's house. Yarborough recalled either helping place Romines' bags in the pizza delivery man's truck or handing the bags to Romines, who then placed the bags in the truck. Yarborough testified that she saw Romines leave Howard's house with the pizza delivery man.
At trial, evidence was presented that Fitzpatrick was seen carrying a knife before the stabbing occurred, but not afterward. Specifically, Fitzpatrick's Pro Pizza employers, Bradford and Degele, testified that during the time frame that Fitzpatrick worked for Pro Pizza he carried a knife on his person, but that after the stabbing they never saw that knife again. Degele, however, did not remember the last time he saw Fitzpatrick with the knife before the stabbing. According to Degele, he confronted Fitzpatrick regarding not carrying the knife after the stabbing, and Fitzpatrick indicated it would not be very smart to carry a knife around because the police were conducting a murder investigation.
During the investigation, Fitzpatrick made several statements to Detective Jeffrey Bousquet denying involvement in the crime. Fitzpatrick admitted that he picked Romines up at the 7-Eleven and *506 dropped her off at the Sunny Palms Motel. Fitzpatrick denied ever seeing Romines again. Diane Fairbanks, who resided with Fitzpatrick at the time of the murder, and was still Fitzpatrick's girlfriend at the time of trial, testified that Fitzpatrick was home between 12:30 and 1 a.m. on August 18, 1996, roughly the same time other witnesses testified to seeing Fitzpatrick with Romines leaving Howard's house.[3] Fitzpatrick also denied having sexual intercourse with Romines, until the detective confronted him with the DNA results. At that point, Fitzpatrick admitted that he had sexual contact with Romines on August 17, 1996, between 9:30 a.m. and noon at the Water's Edge Apartments. Fitzpatrick stated that he saw Romines at the dumpster at Water's Edge and then they went to his house, had sexual intercourse on the couch, and he paid her twenty-five dollars. Bousquet also inquired whether Fitzpatrick would submit a blood sample to the police, which Fitzpatrick ultimately did. Evidence presented revealed that Fitzpatrick asked Dawn Moore, his sister who was a nurse, for a couple of vials of blood. Moore informed Fitzpatrick that she could not obtain blood samples for him.

ANALYSIS
Fitzpatrick presents eleven claims on appeal.[4] We address each claim in turn. We also address whether Fitzpatrick's death sentence is proportionate. As is more fully addressed below, we affirm the convictions and sentence of death, and vacate Fitzpatrick's sentence for the noncapital offense of sexual battery and remand for resentencing in a manner consistent with this opinion.

MOTION FOR JUDGMENT OF ACQUITTALIDENTITY
As his first claim on appeal, Fitzpatrick asserts that the trial court erred in denying his motion for judgment of acquittal because the circumstantial evidence in this case was not inconsistent with Fitzpatrick's reasonable theory of innocence. However, Fitzpatrick invokes an inapplicable standard. Contrary to Fitzpatrick's assertion that this case is wholly circumstantial, this Court need not apply the special standard of review applicable to circumstantial evidence cases because the State presented direct evidence in the form of DNA evidence and eyewitness testimony. See Pagan v. State, 830 So.2d 792, 803-04 (Fla.2002).
*507 In reviewing a motion for judgment of acquittal, a de novo standard of review applies. See id. at 803. Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. See id. (citing Donaldson v. State, 722 So.2d 177 (Fla.1998); Terry v. State, 668 So.2d 954, 964 (Fla. 1996)). If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. See id. (citing Banks v. State, 732 So.2d 1065 (Fla.1999)). In moving for a judgment of acquittal, a defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." Beasley v. State, 774 So.2d 649, 657 (Fla.2000) (quoting Lynch v. State, 293 So.2d 44, 45 (Fla. 1974)). We have repeatedly reaffirmed the general rule that "courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." Lynch, 293 So.2d at 45; see also Morrison v. State, 818 So.2d 432, 451 (Fla.), cert. denied, 537 U.S. 957, 123 S.Ct. 406, 154 L.Ed.2d 308 (2002); Gordon v. State, 704 So.2d 107, 112 (Fla. 1997).
In this case, Fitzpatrick contends that he had a consensual sexual encounter with Romines between 9 a.m. and noon fifteen to eighteen hours before she was found naked and bleeding on the side of the roadand that Romines was killed by someone else. The evidence against Fitzpatrick can be summarized generally as follows:
1. Hall, the SAVE nurse, testified to numerous injuries and markings to Romines' body that led her to conclude that Romines had suffered forced sexual activity. Hall also concluded that the sexual activity occurred within a fairly close proximity of time, a maximum of an hour or two, before Romines was found.
2. The DNA profile that was developed from Romines' vaginal swabs was consistent with the DNA profile that was developed from the known blood standard of Fitzpatrick.
3. Fitzpatrick repeatedly denied having sexual intercourse with Romines until he was confronted with the DNA evidence. At that point, Fitzpatrick admitted that he had sexual intercourse with Romines between 9 a.m. and noon on August 17, 1996.
4. Fitzpatrick admitted picking up Romines at the 7-Eleven and dropping her off at the Sunny Palms Motel, but denied any further contact. Two eyewitnesses testified that they last saw Romines alive with Fitzpatrick leaving Howard's house at midnight on August 17. Another eyewitness testified that she saw the same Pro Pizza truck at the Sunny Palms Motel and later at Howard's house.
5. Fitzpatrick's Pro Pizza employers, Degele and Bradford, testified that Fitzpatrick regularly carried a knife, but that they never saw him with it again after the stabbing.
6. After detectives asked Fitzpatrick for a blood sample, Fitzpatrick attempted to have his sister, a nurse, assist him in obtaining two blood samples other than his own.
In moving for judgment of acquittal, Fitzpatrick admits every conclusion favorable to the State that a jury might fairly and reasonably infer from the evidence. See Beasley, 774 So.2d at 657. Fitzpatrick was the last person seen with Romines alive three hours before she was discovered *508 on the side of the road, there was DNA evidence matching Fitzpatrick to the source of the semen recovered from Romines, and evidence revealed that Romines had what was likely a forced sexual encounter two hours before her death. Moreover, Fitzpatrick denied his involvement with Romines only to change his story when confronted with DNA evidence. In addition, Fitzpatrick attempted to secure false blood samples. Finally, Fitzpatrick was never again seen in possession of a knife he was known to carry after the murder. Based on the foregoing, we conclude that the State presented competent, substantial evidence to support the conviction. Therefore, the trial court did not err in denying Fitzpatrick's motion for judgment of acquittal.
Fitzpatrick also contends that the evidence against him is not sufficient for a jury to find that Fitzpatrick, and no one else, had committed the charged offense. As support for this argument, Fitzpatrick asserts that after the attack Romines identified someone named "Steve," not Fitzpatrick, as the person who attacked her. However, the evidence established that while Romines initially mentioned someone named "Steve," presumably Stephen Kirk, she later in the hospital indicated to the detectives that "Steve" actually was not her assailant. Further, the paramedic who treated Romines at the scene testified that Romines was in and out of consciousness and possibly did not understand the questions posed to her. Moreover, evidence conclusively exculpated Stephen Kirk from any involvement in the crime. Based on the foregoing, we conclude Fitzpatrick's convictions are supported by the sufficiency of the evidence.

MOTION FOR JUDGMENT OF ACQUITTALPREMEDITATION & FELONY MURDER
Next, Fitzpatrick claims the trial court erred in denying his motion for judgment of acquittal with regard to premeditation and felony murder. As stated above, courts should not grant a motion for judgment of acquittal "unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." Morrison, 818 So.2d at 451 (quoting Lynch, 293 So.2d at 45). Furthermore, we have stated: "A judgment of conviction comes to this Court with a presumption of correctness and a defendant's claim of insufficiency of the evidence cannot prevail where there is substantial and competent evidence to support the verdict and judgment." Id. (quoting Donaldson v. State, 722 So.2d 177, 182 (Fla.1998)). The fact that the evidence is contradictory does not warrant a judgment of acquittal because the weight of the evidence and the witnesses' credibility are questions solely for the jury. See id. It is not this Court's function to retry a case or reweigh conflicting evidence submitted to the trier of fact. See id.
In the present case, the State sought a first-degree murder conviction on alternative theories of premeditated murder and felony murder with the underlying offense of sexual battery. Thus, because a general verdict form was used in this case, to affirm Fitzpatrick's first-degree murder conviction, there must be competent, substantial evidence supporting either premeditated or felony murder (predicated on sexual battery). See id. at 452; see also Jones v. State, 748 So.2d 1012, 1024 (Fla. 1999) (citing Mungin v. State, 689 So.2d 1026, 1029-30 (Fla. 1995)).
First, Fitzpatrick asserts that the trial court erred in failing to grant a judgment of acquittal on the question of felony murder because the State did not present sufficient evidence to support a conviction for *509 felony murder with sexual battery as the underlying felony offense. Fitzpatrick contends that he had a consensual sexual encounter with the victim between 9 a.m. and noon on August 17fifteen to eighteen hours before she was found. However, record evidence contradicts the timing of events outlined by Fitzpatrick. Evidence presented at trial indicated that the amount of seminal fluid containing Fitzpatrick's DNA found in the victim confirmed that sexual intercourse took place only one to two hours before she was found. See Lightbourne v. State, 438 So.2d 380, 391 (Fla.1983) (determining that the fact that the defendant's sperm and semen traces were discovered in the victim's vagina indicating sexual relations at approximately the time of death supported the finding of sexual battery). The evidence established that Fitzpatrick's sexual encounter with the victim occurred between 1 a.m. and 3 a.m. on August 18.
Further, Fitzpatrick's contention that sexual intercourse with the victim was consensual was contravened by the circumstances under which the victim was found. Specifically, the victim was found naked with her bloody undergarment wrapped around her waist near her breasts, her breasts were deep purple, and there was a penetrating wound in the breast area that was either another stab wound or a bite mark, puffiness around her head, bruising on her arms, scratches covering her legs, and a cigarette burn on her leg. See Carpenter v. State, 785 So.2d 1182, 1196 (Fla.2001) (determining that the evidence that demonstrated that the victim's own bra was placed across her mouth as a gag "was inconsistent with consensual behavior"); Zack v. State, 753 So.2d 9, 18 (Fla. 2000) (determining that although "there is evidence from which a jury could conclude that [the victim] originally intended to engage in consensual intercourse with [the defendant], such evidence does not negate" a finding to the contrary). The State presented competent, substantial evidence from which the jury could find that there was sufficient evidence that the killing occurred during a sexual battery, and therefore the trial court did not err in denying Fitzpatrick's motion for judgment of acquittal.
Next, Fitzpatrick asserts that the trial court erred in failing to grant a judgment of acquittal on the question of premeditated murder. Assuming without deciding whether the trial court erred,[5] we find that any error would be harmless because the evidence clearly supported a first-degree murder conviction on a felony murder theory. See Jenkins v. State, 692 So.2d 893, 894 (Fla.1997); Mungin v. State, 689 So.2d 1026 (Fla.1995).

MOTION TO SUPPRESSSTATEMENTS
Fitzpatrick claims that the trial court erred in denying his motion to suppress statements. This Court has explained the *510 standard of review for orders on motions to suppress:
[A]ppellate courts should continue to accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.
Nelson v. State, 850 So.2d 514, 521 (Fla. 2003) (quoting Connor v. State, 803 So.2d 598, 608 (Fla.2001)). Specifically, Fitzpatrick asserts that the trial court erred in suppressing his statements made (1) during the initial September 20, 1996, interview with Detective Bousquet; (2) during a conversation on September 21, 1996, with Bousquet at the Pro Pizza parking lot; (3) during telephone conversations with Bousquet on September 23, 1996, and September 25, 1996; and (4) during his last interview with Bousquet on December 5, 1996.
In the instant case, Fitzpatrick was initially questioned at the sheriff's office on September 20, having voluntarily complied with a detective's request for an interview. Fitzpatrick drove to the station where he was interviewed for approximately forty-five minutes to an hour. The record reveals that Fitzpatrick was specifically informed that he was not under arrest. When Fitzpatrick asked, "Am I under arrest?" Bousquet responded, "No. You're not under arrest. I told you when you came out here you weren't under arrest." Moreover, when Fitzpatrick said, "Maybe I need to talk to a lawyer," Bousquet responded, "That's perfectly up to you ... I can't hold you.... I told you when you came in you weren't in custody; you're still not in custody." In fact, Fitzpatrick left the station after requesting an attorney.
With regard to this initial interview, the trial court ruled that any statements Fitzpatrick made to the detective during the initial September 20 interview after he invoked his right to counsel would be inadmissible, but all other statements would be admitted. The trial court specifically found that Fitzpatrick was not in custody during the September 20 interview. We agree.
The United States Supreme Court has held that Miranda[6] warnings are not required if the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview. See California v. Beheler, 463 U.S. 1121, 1121-22, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). The Supreme Court has explicitly recognized that Miranda warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." Id. at 1125, 103 S.Ct. 3517 (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). In determining whether a suspect is in custody, "the ultimate inquiry is simply whether there is a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Id. (quoting Mathiason, 429 U.S. at 495, 97 S.Ct. 711).
This Court has stated that under the dictates of Miranda a suspect involved in a custodial interrogation by law enforcement officials is entitled to the procedural safeguard of the Miranda warning, "the key being that the suspect must be in custody." Correll v. State, 523 So.2d 562, 564 (Fla. *511 1988) (holding that the defendant was not in custody for purposes of Miranda where, after being asked to go to the sheriff's office, the defendant voluntarily went to the police station, was interviewed for approximately a half an hour to an hour, and the defendant left when the interview was over); see also Roman v. State, 475 So.2d 1228, 1231 (Fla.1985) (holding no requirement for Miranda warnings where suspect voluntarily accompanied investigators to the station house, was not handcuffed, and was interrogated approximately three and one half hours prior to his confession). This Court has determined that this inquiry "is approached from the perspective of how a reasonable person would have perceived the situation." Id. at 1231.
Here, Fitzpatrick was specifically told that he was not under arrest. This Court has specifically explained that "a reasonable person might be more likely to think he is not in custody if specifically told he is not under arrest." Id. That Fitzpatrick's interview took place at a station house does not by itself transform an otherwise noncustodial interrogation into a custodial one. See id. Knowledge that he was free to leave, coupled with the fact that his request for a lawyer discontinued further questioning, and that he indeed left the station at that point, afforded a reasonable basis for Fitzpatrick to believe that he was free to leave. Fitzpatrick has demonstrated no basis for a reasonable belief that during this interview there was a restraint on his freedom of movement of the degree associated with a formal arrest. This Court concludes that Fitzpatrick was not in custody for the purposes of Miranda, and therefore the police were not required to advise him of his constitutional rights. Accordingly, the trial court did not err in denying Fitzpatrick's motion to suppress the statements he made to the detectives during the September 20 interview.
Further, with regard to the September 20 interview, Fitzpatrick contends that the interview became coercive when Bousquet presented Fitzpatrick with false evidence suggesting that he had a satellite image of Fitzpatrick with Romines. However, this Court has held that police misrepresentations alone do not necessarily render a confession involuntary. See Escobar v. State, 699 So.2d 988, 994 (Fla.1997). The determination of voluntariness is based upon the totality of the circumstances. See id. (citing Traylor v. State, 596 So.2d 957, 964 (Fla.1992)).
The record on appeal indicates that Bousquet stated to Fitzpatrick, "We also place you with our female, picking her up at 7-Eleven. We also can placeand I'll show you the world wide net of an actual satellite systems. We were able to arrange a satellite system, candid satellite system to find out what we could find." Bousquet testified at the suppression hearing that he informed Fitzpatrick that they "had satellite imagerywe could get satellite imagery, and I told him that I knew exactly where he was.... I never said that I hadputting him in that location." The detective testified that the satellite photograph was of the crime scene and that he did not show Fitzpatrick the photograph to make Fitzpatrick think that the detectives had a satellite photograph of him at the crime scene.
Here, the police were not deceptive in a manner that would have rendered Fitzpatrick's statements involuntary. The detective never stated that he had in his possession a satellite picture of Fitzpatrick at the crime scene, but only that the detective was able to arrange a satellite system "to find out what we could find." The fact that the detective informed Fitzpatrick that he "knew exactly where [Fitzpatrick] was" is not deceptive because the detective *512 had the 7-Eleven video surveillance pictures placing Fitzpatrick at the 7-Eleven.
Fitzpatrick's second allegation, that the trial court erred in admitting the statements Fitzpatrick made to Bousquet on September 21, 1996, at the Pro Pizza parking lot, is also meritless. The evidence indicates that on September 21 Bousquet visited the Pro Pizza parking lot to obtain measurements pertaining to the Romines investigation. The evidence indicates that Fitzpatrick approached Bousquet and initiated a conversation.
In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held that an accused "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85, 101 S.Ct. 1880 (emphasis added); see also Francis v. State, 808 So.2d 110, 126 (Fla.2001) ("The law is well-settled that once an accused has invoked his right to counsel any interrogation must immediately cease until counsel is made available, unless the accused himself initiates further communications with the police."). This Court has likewise held:
Once a suspect has requested the help of a lawyer, no state agent can reinitiate interrogation on any offense throughout the period of custody unless the lawyer is present, although the suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel.

Traylor v. State, 596 So.2d 957, 966 (Fla. 1992) (footnote omitted) (emphasis added); see also Jennings v. State, 718 So.2d 144, 149 (Fla.1998).
In the instant action, the trial court found that there was a sufficient interval between the discussion on September 20, when Fitzpatrick requested time to obtain a lawyer, and the discussion in the Pro Pizza parking lot, which the court found Fitzpatrick initiated. We agree with the trial court's finding. Here, Bousquet did not begin talking to Fitzpatrick on September 21 until Fitzpatrick approached him and initiated the conversation. Accordingly, this Court holds that these statements are admissible because, after asserting his right to counsel at the initial September 20 interview with Bousquet, it was Fitzpatrick who on his own subsequently and voluntarily initiated contact with the detective.
In addition, the trial court found that the discussion between Fitzpatrick and his parole officer did not amount to sufficient pressure by the parole officer to overcome Fitzpatrick's freedom to resist any cooperation with the detectives. We agree. Contrary to Fitzpatrick's contention, the fact that Fitzpatrick's parole officer informed him that it was in his best interest to cooperate with the authorities does not rise to the level of coercion to render Fitzpatrick's statement involuntary. See Maqueira v. State, 588 So.2d 221, 223 (Fla.1991) ("The fact that a police officer agrees to make one's cooperation known to prosecuting authorities and to the court does not render a confession involuntary."); see also State v. Williams, 358 So.2d 1094, 1094-95 (Fla. 1st DCA 1978) (determining that the officer informing the defendant that if contacted by the parole commission, the only thing the officer could do was tell the truth concerning the defendant's cooperation or lack of it in the investigation would not vitiate the defendant's otherwise voluntary confession). Accordingly, this Court holds that Fitzpatrick's parole officer's advising him to cooperate did not vitiate Fitzpatrick's voluntary statements.
*513 With regard to the statements Fitzpatrick made to Bousquet during their telephone conversations on September 23, 1996, and September 25, 1996, the trial court did not err in denying Fitzpatrick's motion to suppress. The evidence indicates that on September 23, it was Fitzpatrick who called Bousquet and left a message. The detective then returned Fitzpatrick's call and they had a brief conversation. Later that same day, Fitzpatrick left another message for Bousquet and the detective returned that call on September 25, resulting in another brief conversation. We hold that Fitzpatrick voluntarily initiated the communication with the police by calling Bousquet on these two occasions. Fitzpatrick's calling and leaving messages to speak with Bousquet was a voluntary initiation of contact within the meaning of Edwards. See Jones v. State, 748 So.2d 1012, 1018 (Fla. 1999) (holding that where a defendant invokes his right to counsel and subsequently reinitiates contact with law enforcement officials by asking to speak with a detective, who is unavailable, but later responds to the defendant's request, there is a voluntary initiation of contact within the meaning of Edwards).
Finally, Fitzpatrick's assertion that the statements he made during his last interview with the detective on December 5, 1996, are inadmissible because he was effectively in custody due to the police processing his vehicle also fails. The evidence surrounding this last interview reveals that Fitzpatrick arrived at the sheriff's office in his own car, was never restrained, and was free to leave at any time. This evidence supports our conclusion that Fitzpatrick voluntarily went to the station and was not in custody. Therefore, the trial court did not err in denying Fitzpatrick's motion to suppress.

MOTION TO SUPPRESSDNA
A trial judge's ruling on a motion to suppress is clothed with a presumption of correctness with regard to determinations of historical fact. However, appellate courts must independently review mixed questions of law and fact. See Connor v. State, 803 So.2d 598, 608 (Fla. 2001) ("[T]he determination of whether the application of the law to the historical facts establishes an adequate basis for the trial court's ruling is subject to de novo review."). Fitzpatrick claims that the trial court erred in denying his motion to suppress the DNA results obtained from his blood sample because he did not give voluntary consent but was merely acquiescing to the authorities' requests to avoid violating his parole and being returned to prison.
In this action, Fitzpatrick's parole officer, George Kranz, testified in a suppression hearing that he never informed Fitzpatrick that if Fitzpatrick did not cooperate with the authorities he was going to revoke Fitzpatrick's parole. Kranz testified that he "simply advised [Fitzpatrick] that the best course of action was for him to be truthful in all matters, and that it would be reported. All he needed to do was be truthful." This Court has held that "a confession is not rendered inadmissible because the police tell the accused that it would be easier on him if he told the truth." Bush v. State, 461 So.2d 936, 939 (Fla. 1984). Fitzpatrick's consent, therefore, is not rendered involuntary because his parole officer advised him that it would be easier on him if he stated the truth.
Further, Kranz testified that he informed Fitzpatrick that "everything would be reported whether he answered truthfully or not." This testimony does not indicate that Kranz promised Fitzpatrick that only by cooperating with the police would Fitzpatrick *514 avoid violating his parole and being returned to prison. The testimony reveals that Kranz merely told Fitzpatrick that the information he provided would be given to the parole commission, irrespective of whether Fitzpatrick cooperated or not, simply to keep the parole commission informed regarding the situation. Kranz's explaining to Fitzpatrick that he would inform the parole commission, regardless of whether Fitzpatrick cooperated, supports our determination that Kranz's conversation with Fitzpatrick does not rise to the level of coercion sufficient to render Fitzpatrick's statement involuntary.
Moreover, even if there was police misconduct in pressuring Fitzpatrick to provide a blood sample, the DNA evidence was properly admitted because Fitzpatrick's DNA would ultimately have been discovered. In Nix v. Williams, 467 U.S. 431, 448, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the United States Supreme Court adopted the "inevitable discovery" exception to the "fruit of the poisonous tree" doctrine. Under this exception, "evidence obtained as the result of unconstitutional police procedure may still be admissible provided the evidence would ultimately have been discovered by legal means." Maulden v. State, 617 So.2d 298, 301 (Fla.1993). In adopting the inevitable discovery doctrine, the Supreme Court explained, "Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." Nix, 467 U.S. at 446, 104 S.Ct. 2501. In making a case for inevitable discovery, the State must demonstrate "that at the time of the constitutional violation an investigation was already under way." Moody v. State, 842 So.2d 754, 759 (Fla.2003) (quoting Nix v. Williams, 467 U.S. 431, 457, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (Stevens, J., concurring in the judgment)); see also Jeffries v. State, 797 So.2d 573, 578 (Fla. 2001); Maulden, 617 So.2d at 301. In other words, the case must be in such a posture that the facts already in the possession of the police would have led to this evidence notwithstanding the police misconduct. See Moody, 842 So.2d at 759.
In this case, the police had initiated an investigation of Fitzpatrick prior to requesting a blood sample. See id. (determining that the evidence did not support the application of the inevitable discovery doctrine where the police had not initiated any investigation of the defendant for the murder prior to the police misconduct, and the police had no reason to suspect the defendant had any involvement in the murder). The record reveals that the police considered Fitzpatrick a suspect prior to requesting a blood sample from him based on evidence that Fitzpatrick was the last person to be seen with Romines alive leaving Howard's house at approximately midnight three hours before she was found. Based on this evidence, requesting a blood sample from Fitzpatrick or obtaining it through a warrant would have been a normal investigative measure that would have occurred regardless of any police impropriety. See Jeffries, 797 So.2d at 578 (concluding that the evidence would have been found independently by means of normal investigative measures that inevitably would have been set in motion as a matter of routine police procedure). Therefore, even if Fitzpatrick's consent to the taking of his blood was involuntary, the error is harmless because the police had probable cause for a warrant requiring a blood sample, and the blood sample would have been inevitably obtained.

INTRODUCTION OF ROMINES' STATEMENTS MADE AT THE HOSPITAL
A trial judge's ruling on the admissibility of evidence will not be disturbed *515 absent an abuse of discretion. See Alston v. State, 723 So.2d 148, 156 (Fla. 1998); see also Kearse v. State, 662 So.2d 677, 684 (Fla.1995); Blanco v. State, 452 So.2d 520, 523 (Fla.1984). In the instant case, the trial court ruled that Romines' statements made on the side of the road to the individuals who came to her aid were admissible as "excited utterances," and Romines' statements made at the hospital were admissible for impeachment purposes.
Fitzpatrick asserts that the trial court abused its discretion in allowing into evidence Romines' hearsay statements made at the hospital. The initial question is whether the proposed testimony constitutes hearsay at all. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (2001). Romines' statements made at the hospital are not hearsay because the statements were offered in evidence not to prove the truth of the matter asserted, but merely for impeachment purposes to demonstrate inconsistency with Romines' statements made at the crime scene. See Ellis v. State, 622 So.2d 991, 996 n. 3 (Fla.1993) ("Impeachment's object is to attack the credibility of the witness.... [T]the evidence so introduced is not being admitted `to prove the truth of the matter asserted' but rather to show why the witness is not trustworthy."). Therefore, the hearsay rule does not preclude admission of the statements under review.
Further, the trial court properly admitted the statements for impeachment purposes pursuant to section 90.806(1), Florida Statutes (2001), which provides:
When a hearsay statement has been admitted in evidence, credibility of the declarant may be attacked and, if attacked, may be supported by any evidence that would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time inconsistent with the declarant's hearsay statement is admissible, regardless of whether or not the declarant has been afforded an opportunity to deny or explain it.
(Emphasis added.) In this action, the trial court admitted into evidence Romines' hearsay statements made when she was found on the side of the road, that "Steve" was her assailant, as excited utterances. Romines' statements made at the hospital, nodding that "Steve" was not her assailant, was "evidence of a statement or conduct by the declarant ... inconsistent with the declarant's hearsay statement," which pursuant to section 90.806(1), Florida Statutes (2001), "is admissible, regardless of whether or not the declarant has been afforded an opportunity to deny or explain it." Therefore, it is irrelevant that Romines, the declarant, who was dead at the time of trial, was not afforded the opportunity to deny or explain the inconsistency. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the testimony with regard to Romines' statements made to the police at the hospital for the limited purpose of impeachment.[7]

*516 MOTION FOR MISTRIALFITZPATRICK MENTIONED "HE THOUGHT HE NEEDED AN ATTORNEY"
A trial court's ruling on a motion for mistrial is subject to an abuse of discretion standard of review. See Goodwin v. State, 751 So.2d 537, 546 (Fla.1999). A motion for mistrial "should be granted only when it is necessary to ensure that the defendant receives a fair trial." Id. at 547 (quoting Cole v. State, 701 So.2d 845, 853 (Fla.1997)). Fitzpatrick asserts that the trial court erred in not granting a mistrial when Detective Bousquet testified that during the initial interview Fitzpatrick mentioned that he thought he needed an attorney. Bousquet testified in pertinent part:
From there I asked [Fitzpatrick] if he had any type of sexual intercourse with the victim, and he stated he had not. I confronted [Fitzpatrick] about picking up the female at A.J.'s residence, and he states that he didn't pick her up there. [Fitzpatrick] said the last time he saw the victim was when he dropped her off at the motel. [Fitzpatrick] said he went to check back on the victim at the motel, but she had already gone. [Fitzpatrick] stated he was afraid, because in the last item of the news article that he had read, it stated that the person would be charged with murder, and he did not want to be charged with murder. I informed [Fitzpatrick] I did not state he was going to be charged with anything, and he stated he read this in the paper, and that is why he was scared.
Subsequently [Fitzpatrick] did make mention that he thought he needed an attorney.
At that point in Bousquet's testimony, Fitzpatrick's counsel moved for a mistrial, which the trial court denied. Specifically, the record reveals that Fitzpatrick stated, "Maybe I need to talk to a lawyer."
Bousquet's testimony at trial that Fitzpatrick "did make mention that he thought he needed an attorney" was "fairly susceptible of being interpreted by the jury as a comment on silence," and was therefore improper. State v. DiGuilio, 491 So.2d 1129, 1131 (Fla.1986) (concluding that a police officer's testimony that "[a]fter that, [defendant] advised me he felt like he should speak to his attorney" was "fairly susceptible of being interpreted by the jury as a comment on silence"); see also Smith v. State, 492 So.2d 1063, 1065 (Fla. 1986) (determining the detective's testimony that the defendant stated "I want to talk to a lawyer" was "a comment on the exercise of the right to remain silent").
In DiGuilio, we explained that improper comments on a defendant's invocation of his right to remain silent are subject to a harmless error analysis. See 491 So.2d at 1137. This Court explained *517 the proper test that appellate courts must apply when performing a harmless error analysis:
The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact. The question is whether there is a reasonable possibility that the error affected the verdict. The burden to show the error was harmless must remain on the state. If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.
Id. at 1139; see also Jones v. State, 748 So.2d 1012, 1021-22 (Fla.1999). Application of the harmless error test "requires not only a close examination of the permissible evidence on which the jury could have legitimately relied, but an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict." DiGuilio, 491 So.2d at 1138.
On this record, we conclude that there was no reasonable possibility that Bousquet's testimony affected the jury verdict, and it was therefore harmless beyond a reasonable doubt. There was overwhelming permissible evidence of Fitzpatrick's guilt. The jury was presented with DNA evidence matching Fitzpatrick to the source of the semen recovered from the victim and eyewitness testimony establishing that Romines was last seen alive with Fitzpatrick three hours before she was discovered. The only arguably impermissible testimony placed before the jury was the fact that Fitzpatrick simply stated that he thought he needed an attorney. This Court in Jones, stating that it was convinced "beyond a reasonable doubt that the error complained of did not contribute to the verdict," emphasized that "although the witness did improperly comment on the defendant's invocation of his right to silence, the remark was neither repeated nor emphasized." Jones, 748 So.2d at 1022; see also Cole v. State, 701 So.2d 845, 853 (Fla.1997) (concluding that a remark regarding the defendant's prior criminal history, which the witness had been instructed by the trial court not to mention, was isolated and was not focused on and therefore was not so prejudicial as to require reversal). Here, the impermissible remark was neither repeated nor emphasized, and the trial judge expressly indicated the lack of importance he felt the jury attributed to the remark. Based upon the review of the record, this Court concludes that this isolated and singular comment does not constitute harmful error.

MOTIONS TO SUPPRESS  IDENTIFICATIONS
Next, Fitzpatrick asserts that the trial court erred in denying his motions to suppress Albert J. Howard and Melanie Yarborough's out-of-court and in-court identifications of Fitzpatrick. A trial judge's determination of historical facts on a motion to suppress is clothed with a presumption of correctness. See Connor, 803 So.2d at 608. Appellate courts engage in independent or "de novo" review of mixed questions of law and fact. See id.
This Court has explained that the test for suppression of an out-of-court identification is two-fold: "(1) whether the police used an unnecessarily suggestive procedure to obtain the out-of-court identification; and (2) if so, considering all the circumstances, whether the suggestive procedure gave rise to a substantial likelihood *518 of irreparable misidentification." Rimmer v. State, 825 So.2d 304, 316 (Fla. 2002). This Court considers the following factors in evaluating the second prong, the likelihood of misidentification:
[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Grant v. State, 390 So.2d 341, 343 (Fla. 1980) (quoting Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). If the procedures used by the police in obtaining the out-of-court identification were not unnecessarily suggestive, however, the court need not consider the second part of the test. See Rimmer, 825 So.2d at 316.

A. Albert J. Howard's Identifications
Fitzpatrick challenges Howard's identification on the basis that (1) showing Howard a single driver's license photo of Fitzpatrick prior to a photo array was unnecessarily suggestive; and (2) showing Howard an array of photographs including only men with beards when Howard indicated that the man he saw was clean-shaven was unnecessarily suggestive. The evidence indicates that on September 20, 1996, Howard was shown a single driver's license photo of Fitzpatrick, and could not identify the man on the license as the pizza delivery man he observed leaving his house with Romines. On September 23, 1996, Howard picked Fitzpatrick out of a photo array. The trial court denied Fitzpatrick's motion to suppress the identification by Howard, finding that there was not any substantial likelihood that Howard's picking Fitzpatrick's photograph out of the array was influenced by the earlier showing to him of the single driver's license photo because the two photos were quite different.
This Court has determined that "the showing of a single photo [i]s unduly suggestive." Washington v. State, 653 So.2d 362, 365 (Fla.1994). Thus, showing Howard a single driver's license photo of Fitzpatrick was unduly suggestive. However, a pretrial identification obtained from suggestive procedures is not per se inadmissible, but may be introduced into evidence if "found to be reliable and based solely upon the witness' independent recollection of the offender at the time of the crime, uninfluenced by the intervening illegal confrontation." Id. (quoting Edwards v. State, 538 So.2d 440, 442 (Fla.1989)). The record demonstrates that Howard got a good look at Fitzpatrick, who was at Howard's home for fifteen to twenty minutes. Howard testified that he had no problem observing Fitzpatrick because Fitzpatrick was directly in front of him, five to ten feet away. Howard also indicated that he had a conversation with Fitzpatrick in a well-lit room within the five- to ten-foot range. Given this sufficient degree of attention, we determine that even though showing a single photo prior to a photo array consisting of six pictures was unduly suggestive, Howard's ample opportunity to observe Fitzpatrick closely provided an independent basis for the identification, uninfluenced by the suggestive procedure. Moreover, any claim that the procedure was suggestive is diminished by the fact that Howard was not able to identify Fitzpatrick in the single driver's license photo.
Fitzpatrick's allegation that the police further tainted Howard's out-of-court identification by including only men with beards in the photo array, after Howard had indicated that the man he saw was clean-shaven, also fails. The evidence indicates that the police showed Howard an *519 array of six photographs. The photo array was not tainted by the mere fact that Fitzpatrick had a beard in his picture because all the men depicted in the photopack had that similar characteristic; all had beards. See Green v. State, 641 So.2d 391, 394-95 (Fla.1994). This is not a case where the police showed five bearded men and a clean-shaven Fitzpatrick, or a case where the police directed Howard's attention to one picture. Instead, the police showed Howard an array of six photographs, all of which depicted men with similar characteristics. Moreover, the fact that Howard stated that the man he saw the night in question was clean-shaven, yet could identify a bearded Fitzpatrick out of an array of bearded men, certainly bolsters the conclusion that Howard had a good opportunity to observe Fitzpatrick and eliminates any chance of misidentification. Accordingly, we conclude that the composition of the photo array in the instant case was not unduly suggestive.
Next, Fitzpatrick contends that the trial court erred in failing to exclude Howard's courtroom identification of Fitzpatrick. An in-court identification may not be admitted "unless it is found to be reliable and based solely upon the witness' independent recollection of the offender at the time of the crime," uninfluenced by any intervening illegal confrontation. Edwards, 538 So.2d at 442. This Court in Edwards explained:
In gauging the reliability of an in-court identification, the trial judge must consider the following factors: the prior opportunity the witness had to observe the alleged criminal act; the existence of any discrepancy between any pretrial lineup description and the defendant's actual description; any identification prior to the lineup of another person; any identification by picture of the defendant prior to the lineup; failure to identify the defendant on a prior occasion; any time lapse between the alleged act and the lineup identification; and any other factors raised by the totality of the circumstances that bear upon the likelihood that the witness' in-court identification is not tainted by the illegal lineup.
Id. at 443. It is the State's burden to demonstrate by clear and convincing evidence that the courtroom identification had an independent source or that its introduction into evidence was in any event harmless error. See id. at 444. The State has satisfied its burden in this case.
Howard's testimony demonstrates his independent recollection of Fitzpatrick. Specifically, Howard testified that Fitzpatrick was in his house for ten to fifteen minutes, that he had a conversation with Fitzpatrick, and that seeing Fitzpatrick stood out in his mind because he was waiting for a pizza that night when Fitzpatrick, working as a Pro Pizza delivery man, arrived with a pizza. This situation is unlike the situation in Edwards, where this Court could not conclude that the witness's in-court identification had an independent source because the witness observed the defendant for only a few seconds, at which time the witness stated he had no reason to pay attention, and thus it was likely that his in-court identification was induced by the pretrial lineup. See Edwards, 538 So.2d at 444. Howard's in-court identification of Fitzpatrick was admissible. See Perez v. State, 648 So.2d 715, 719 (Fla.1995) (holding the in-court identification admissible, independent of the show-up, based on the witness's ability to observe the defendant at the crime scene for about a minute, within eight to ten feet). Therefore, we find no error.
Finally, Fitzpatrick contends that Howard's in-court identification was further tainted by Howard's being informed *520 the day of the suppression hearing that he had picked the right photo out of the array, thus improperly bolstering Howard's confidence in his identification. This claim is unpersuasive. Given the testimony regarding the ample opportunity Howard had to observe Fitzpatrick, Fitzpatrick cannot sustain the argument that Howard's simply being informed that he picked the right photo out of the array prior to the suppression hearing unduly bolstered his identification. See Paschal v. State, 251 So.2d 257, 259 (Fla.1971) (rejecting the defendant's contention that the in-court identification was improperly bolstered by the witnesses' view of the defendant at the inquest when the witness clearly saw the faces of the men at the time of the crime and had identified them from photographs prior to the inquest); Holton v. State, 535 So.2d 678, 679 (Fla. 1st DCA 1988) (finding that, notwithstanding viewing the defendant at a pretrial hearing, the reliability of the witness's in-court identification was supported by the fact that the victim had ample opportunity to view the defendant and in addition was able to select the defendant from a photo spread prior to trial). We conclude the in-court identification was properly admitted.

B. Melanie Yarborough's Identifications
Fitzpatrick challenges Yarborough's identification on the grounds that her in-court identification was tainted by the police showing her the photo array again prior to the suppression hearing, thus bolstering her confidence in her identification, and that she had a limited opportunity to observe the pizza delivery man on August 17. The trial court denied Fitzpatrick's motion to suppress the out-of-court identification and any subsequent in-court identification by Yarborough, finding that there was no evidence to indicate that the identifications were the result of any suggestion. That determination is amply supported by the record.[8] The record reveals that a detective explained to Yarborough that the detective "was going to show her a group of photos, and to look at absolutely all of them before she made any decision, to see if the person was indeed there that she recalls being at A.J. Howard's that night." The fact that the detective testified that Yarborough was asked to look at each photograph before deciding, that Yarborough looked at every photo and immediately selected Fitzpatrick's photo in less than ten seconds, coupled with Yarborough's testimony that she got a good look at him for approximately ten minutes, eliminates any chance of misidentification. Based on the foregoing, Yarborough's out-of-court identification of Fitzpatrick was reliable and not the product of suggestion.
Finally, similar to the analysis above regarding Howard's in-court identification, Yarborough's in-court identification was based on her independent recollection of observing Fitzpatrick at Howard's house on the night of August 17, 1996. In addition, given the testimony regarding the ample opportunity Yarborough had to observe Fitzpatrick and the certainty with which she made the identification, Fitzpatrick cannot sustain the argument that Yarborough's viewing the photo array prior to the suppression hearing unduly bolstered her identification. See Paschal, 251 So.2d at 259. We conclude the in-court identification was properly admitted.

EXCLUSION OF EVIDENCE
Next, Fitzpatrick asserts that the trial court deprived him of a fair trial, first by *521 excluding evidence of fingernail scrapings and, second, by failing to allow several witnesses to identify Fitzpatrick on the surveillance tape. These claims will be addressed in turn.
At trial, the court excluded evidence of fingernail scrapings indicating that the victim could be eliminated from the DNA mixture tested from her right hand, but neither Fitzpatrick nor Stephen Kirk could be eliminated; both Fitzpatrick and Stephen Kirk could be eliminated from the mixture tested from her left hand but the victim could not be eliminated; there was evidence of the DNA of another, unknown person in the tissue from the right hand clippings; and the DNA evidence under the victim's fingernails could have been there for a long period of time, depending on when she had last washed her hands or cleaned her nails. The trial court found that "the proffer of the evidence is of a nature that it would be irrelevant and immaterial in its composition ... for the reason that the proffered evidence is inconsequential and does not lead to any conclusion of any kind." This Court has explained that "[t]he trial court has broad discretion in determining the relevance of evidence and such determination will not be disturbed absent an abuse of discretion." Heath v. State, 648 So.2d 660, 664 (Fla.1994).
Assuming, without deciding, that the testimony with regard to the fingernail scrapings was relevant, we conclude that any error in its exclusion was harmless. See DiGuilio, 491 So.2d at 1135. The proferred testimony did not establish any material conclusion due to the expert's inability to accurately determine how long the DNA had been under the victim's fingernails. The proffered evidence also failed to eliminate Fitzpatrick. The tissue from the unknown person could have been explained through the trial testimony of Dwayne Mercer, who testified that when he was with the victim at the crime scene she squeezed his arm and her fingernails went into his flesh. Moreover, the DNA obtained from the victim's vaginal swabs was consistent with Fitzpatrick's. Finally, the defense stressed to the jury the possibility that the perpetrator was someone other than Fitzpatrick. The defense argued that four individuals named Steve lived at Water's Edge Apartments, some of whom were never accounted for; that the victim held up two fingers when questioned whether the victim knew the people that attacked her; and that Howard was a possible suspect based on Cindy Young's testimony.[9] Therefore, the testimony was minimal at best, inconclusive, and would have been inconsequential. After an examination of the entire record, this Court concludes that any error resulting from exclusion of the evidence was harmless. See id.
Next, Fitzpatrick alleges that the trial court erred in precluding Detective Bousquet and Diane Fairbanks from identifying where Fitzpatrick appeared on the surveillance tape. The trial court sustained objections from the prosecutor that "the tape speaks for itself." Fitzpatrick's allegation is that this testimony was vital to the defense to demonstrate that Fitzpatrick was not wearing the clothing described by the eyewitnesses who placed him with Romines shortly before her murder.
This claim fails because, contrary to Fitzpatrick's assertion, the jury was presented with all the conflicting evidence *522 regarding the clothing Fitzpatrick was wearing the night of August 17. Specifically, Fitzpatrick's former Pro Pizza employer testified that he saw the videotape of Fitzpatrick at the 7-Eleven and remembers seeing Fitzpatrick in a kelly-green Pro Pizza shirt. Yarborough testified that the pizza delivery man who arrived at Howard's house was wearing a Pro Pizza shirt.
Bousquet, on the other hand, testified that he viewed a portion of the surveillance tape and the man he thought was Fitzpatrick was not wearing a kelly-green Pro Pizza uniform. Diane Fairbanks testified that she viewed the 7-Eleven surveillance tape and that it was Fitzpatrick on the tape. Fairbanks also indicated Fitzpatrick was wearing shorts and a white T-shirt; however, it is unclear from the record whether Fairbanks saw Fitzpatrick wearing the shorts and T-shirt on the surveillance tape or when he arrived home that night.[10] Moreover, defense counsel played the tape during closing argument and stopped to point out Fitzpatrick and what he was wearing to the jury. Based on this evidence, as we consider all the testimony presented regarding Fitzpatrick's clothing and the fact the jury viewed the tape, we conclude that the testimony of Bousquet and Fairbanks was not vital to the defense because although they were not able to physically point out Fitzpatrick, they did testify to what he was wearing. We find no error.

ALLEGED ERRORS
Fitzpatrick alleges that the trial court committed the following errors that could have rendered his sentence of death unreliable: admitting his grand theft conviction and admitting hearsay regarding his aggravated battery conviction; requiring the prosecutor to present mitigating evidence to the jury; sentencing him to death without the benefit of a comprehensive presentence investigation (PSI); and submitting to the jury and finding of the aggravating circumstance that the homicide was committed during a sexual battery. Each will be addressed in turn.
First, contrary to Fitzpatrick's assertion, the trial court's admission of Fitzpatrick's grand theft conviction was not in error. Section 921.141(5)(a) of the Florida Statutes (2001) allows the trial court in sentencing to consider the following aggravating circumstance: "The capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation." Fitzpatrick was not only previously convicted of a felony, grand theft, but he was on probation for grand theft at the time of the murder. The trial court, therefore, was within its authority pursuant to section 921.141(5)(a) of the Florida Statutes (2001) to admit the grand theft conviction as an aggravating circumstance. See Jackson v. State, 530 So.2d 269, 273 (Fla.1988) ("Evidence of the particular offense for which appellant was on parole may be admitted to establish the aggravating factor permitted by section 921.141(5)(a), Florida Statutes....").
Further, Fitzpatrick contends that the trial court erred in admitting the grand theft conviction to demonstrate Fitzpatrick was on parole for purposes of satisfying section 921.141(5)(a) of the Florida Statutes when his eligibility for this aggravator could have been accomplished by using his conviction for aggravated battery. At the time of the murder, Fitzpatrick was on parole for both grand theft and aggravated battery. The trial court *523 was neither required to use the aggravated battery conviction nor precluded from using the grand theft conviction to establish the "on probation" aggravator, and therefore, no error occurred.
Next, Fitzpatrick asserts that the trial court erred in allowing Fitzpatrick's probation officer, George Kranz, to provide testimony in the penalty phase concerning the details of the aggravated battery committed by Fitzpatrick. This Court has held that "it is appropriate in the penalty phase of a capital trial to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of the conviction." Rhodes v. State, 547 So.2d 1201, 1204 (Fla. 1989). Further, this Court explained that "[t]estimony concerning the events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence." Id. Moreover, this Court has previously held that a police officer may give hearsay testimony concerning a defendant's prior violent felonies. See Jones v. State, 748 So.2d 1012, 1026 (Fla.1999).
Applying these principles, we hold that the trial court properly allowed the probation officer to give hearsay testimony concerning Fitzpatrick's prior violent felony. Moreover, Fitzpatrick could have cross-examined Kranz, thereby undermining the contention that he was not afforded an opportunity to rebut Kranz's hearsay testimony. See Rhodes, 547 So.2d at 1204 ("While hearsay evidence may be admissible in penalty phase proceedings, such evidence is admissible only if the defendant is accorded a fair opportunity to rebut any hearsay statements."). On this basis, we conclude that the trial court did not err.
Second, Fitzpatrick asserts that the trial court erred by requiring the State to present mitigation for Fitzpatrick. This Court has stated "we expect and encourage trial courts to consider mitigating evidence, even when the defendant refuses to present mitigating evidence." Muhammad v. State, 782 So.2d 343, 363 (Fla.2001). This Court has "repeatedly emphasized the duty of the trial court to consider all mitigating evidence `contained anywhere in the record, to the extent it is believable and uncontroverted.'" Id. (quoting Farr v. State, 621 So.2d 1368, 1369 (Fla.1993)). This requirement "applies with no less force when a defendant argues in favor of the death penalty, and even if the defendant asks the court not to consider mitigating evidence." Id. (quoting Farr, 621 So.2d at 1369). "[T]he trial judge must carefully analyze all the possible statutory and nonstatutory mitigating factors against the established aggravators to ensure that death is appropriate." Grim v. State, 841 So.2d 455, 462 (Fla.2003) (quoting Robinson v. State, 684 So.2d 175, 177 (Fla.1996)).
In the instant action, the trial court correctly followed this Court's dictate that "mitigating evidence must be considered and weighed" when, after Fitzpatrick refused to present mitigation, it instructed the prosecution to present the mitigating evidence to Fitzpatrick's jury. See Grim, 841 So.2d at 462; see also Muhammad, 782 So.2d at 361-62 (holding that the trial court erred when it gave great weight to the jury's recommendation in light of the defendant's refusal to present mitigating evidence and the failure of the trial court to provide for an alternative means for the jury to be advised of available mitigating evidence). Here, when Fitzpatrick refused to present mitigating evidence, the trial court provided an alternative means for the jury to be advised of available mitigating evidence by instructing the prosecutor *524 to present the mitigation. The prosecution presented one witness, Fitzpatrick's parole officer, and introduced one exhibit. The mitigation presented through the parole officer's testimony included that Fitzpatrick had a problem with drugs and alcohol, that Fitzpatrick had attempted to commit suicide, Fitzpatrick's family history, and Fitzpatrick's employment history. The trial court not only instructed the jury on the aggravators and mitigators but specifically instructed the jurors that they could consider the mitigating circumstances outlined in section 921.141(6)(f), Florida Statutes (2001), if established by the evidence, and the trial court articulated each mitigator for the jury. Accordingly, this Court concludes that no error occurred below.
Third, Fitzpatrick asserts that the trial court erred in sentencing Fitzpatrick without the benefit of a comprehensive presentence investigation (PSI). This Court requires "the preparation of a PSI in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence." Muhammad, 782 So.2d at 363. This Court explained:
To be meaningful, the PSI should be comprehensive and should include information such as previous mental health problems (including hospitalizations), school records, and relevant family background. In addition, the trial court could require the State to place in the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records.
Id. at 363-64 (emphasis added).
Fitzpatrick contends that without the military records, which were requested but never received, the trial court should not have proceeded to sentence Fitzpatrick. This Court in Muhammad did not absolutely require a trial court to consider a defendant's military records to ensure a comprehensive PSI but only stated that "the trial court could require the State to place in the record all evidence in its possession of a mitigating nature such as school records, military records, and medical records." Id. The rationale behind this Court requiring a comprehensive PSI is to allow the trial court to have before it all the available information regarding the defendant. The substance of the PSI, not the form, is what is important. Therefore, despite the trial court not physically having the military records in the PSI, the trial court was apprised of Fitzpatrick's military background and specifically weighed the mitigation resulting from Fitzpatrick's military service when deciding whether death was the appropriate sentence. Fitzpatrick has offered no indication that any relevant facts of his military service were neglected, and thus no error occurred.
Finally, Fitzpatrick asserts that the evidence was insufficient to submit the sexual battery charge to the jury, and because the jury was allowed to consider sexual battery as an aggravating circumstance at the penalty phase, Fitzpatrick is entitled to a new penalty trial. Contrary to Fitzpatrick's assertion, the evidence at trial was sufficient to support a finding of sexual battery. Specifically, the evidence demonstrated that Romines was found nude with her bloody undergarment wrapped around her waist near her breasts, her breasts were deep purple, there was a penetrating wound in the breast area that was either another stab wound or a bite mark, there was puffiness around her head, there was bruising on her arms, her legs were covered in scratches, and there was a cigarette burn on her leg. Fitzpatrick's DNA was consistent with the DNA present on Romines' vaginal swabs, and Fitzpatrick was the last *525 person seen with Romines alive. This Court has determined that when the facts contained in the record are sufficient to support the finding of sexual battery, they also stand sufficiently strong to support the aggravating circumstance under section 921.141(5)(d) of the Florida Statutes. See Lightbourne v. State, 438 So.2d 380, 391 (Fla.1983) (determining the evidence was sufficient to demonstrate sexual battery and to support the felony murder aggravator where viable sperm and semen traces were discovered in the victim's vagina indicating sexual relations at approximately the time of death, the defendant's blood type was consistent with semen and blood tests, and pubic hair found at the crime scene was miscroscopically matched with those of the defendant); see also Bogle v. State, 655 So.2d 1103, 1108 (Fla.1995) (holding the felony murder aggravating factor based on sexual battery was proven beyond a reasonable doubt where the victim was found nude, the DNA extracted from the semen in the victim's vagina was consistent, although not a positive match, with the defendant's DNA, a pubic hair found on the crotch area of the defendant's pants was consistent with the pubic hair of the victim, and the medical examiner testified that the sexual activity occurred within three hours of the victim's death). Consistent with this Court's precedent, we conclude that the facts contained in the record were sufficient to support the finding of sexual battery, and also stood sufficiently strong to support the aggravating circumstance under section 921.141(5)(d) of the Florida Statutes. Accordingly, we conclude there was no error.

FLORIDA'S DEATH PENALTY STATUTE
Fitzpatrick asserts that Florida's capital sentencing scheme violates the United States Constitution under the holdings of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This Court has addressed this argument and denied relief. See Jones v. State, 845 So.2d 55, 74 (Fla.2003). We conclude that Fitzpatrick is likewise not entitled to relief on this claim. Additionally, one of the aggravating circumstances the trial judge in this action considered was Fitzpatrick's previous aggravated battery conviction. This prior violent felony conviction alone satisfies constitutional mandates because the conviction was heard by a jury and determined beyond a reasonable doubt. See Doorbal v. State, 837 So.2d 940, 963 (Fla.), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Accordingly, Fitzpatrick is not entitled to relief on this claim.

SEXUAL BATTERYSENTENCING GUIDELINES SCORESHEET
Next, Fitzpatrick asserts that his sentence for sexual battery must be vacated because a guidelines scoresheet was not prepared. As Fitzpatrick contends, the record demonstrates that no scoresheet was prepared for the noncapital offense of sexual battery, contrary to the provisions of Florida Rule of Criminal Procedure 3.701(d)(1). This section provides:
One guideline scoresheet shall be utilized for each defendant covering all offenses pending before the court for sentencing. The state attorney's office will prepare the scoresheets and present them to defense counsel for review as to accuracy in all cases unless the judge directs otherwise. The sentencing judge shall approve all scoresheets.
Thus, "rule 3.701(d)(1) mandates that a sentence be imposed based on a sentencing guidelines scoresheet that has been reviewed by the trial judge." Holton v. State, 573 So.2d 284, 290-91 (Fla.1990) *526 (reversing and remanding sentences for noncapital offenses of sexual battery and arson for preparation of scoresheet and consideration by trial judge); see also Lukehart v. State, 776 So.2d 906, 927 (Fla.2000) (holding that the trial court was required to complete a guidelines scoresheet for the noncapital offense, and remanding for a resentencing on the aggravated child abuse conviction); Pietri v. State, 644 So.2d 1347, 1355 (Fla.1994) (vacating appellant's sentences for the noncapital offenses and remanding for resentencing after the preparation and consideration of sentencing guidelines scoresheets). Consistent with prior precedent, we vacate Fitzpatrick's sentence for the noncapital offense of sexual battery and remand for resentencing after a guidelines scoresheet has been prepared and considered by the trial judge.

PROPORTIONALITY
Although Fitzpatrick does not challenge the proportionality of his death sentence, this Court must nevertheless conduct a proportionality review. See Rimmer v. State, 825 So.2d 304, 331 (Fla.), cert. denied, 537 U.S. 1034, 123 S.Ct. 567, 154 L.Ed.2d 453 (2002). In conducting its proportionality review, this Court must compare the totality of the circumstances in a particular case with other capital cases to determine whether death is warranted in the case under review. See id. This review "is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a `thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases.'" Beasley v. State, 774 So.2d 649, 673 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990)).
Here, the trial court found four aggravating factors: (1) Fitzpatrick was under sentence of imprisonment, conditional/control release, when the murder in this case was committed (great weight), see § 921.141(5)(a), Fla. Stat. (2001); (2) Fitzpatrick had previously been convicted of a violent felony to some person when he committed the murder in this case (moderate weight), see § 921.141(5)(b), Fla. Stat. (2001); (3) Fitzpatrick committed the murder in this case while he was committing an involuntary sexual battery on the victim (little weight), see § 921.141(5)(d), Fla. Stat. (2001); and (4) Fitzpatrick committed the murder in this case in an especially heinous, atrocious, or cruel fashion (great weight), see § 921.141(5)(h), Fla. Stat. (2001).
The trial court gave little weight to the statutory mitigator involving the victim's participation in Fitzpatrick's conduct, see § 921.141(6)(c), Fla. Stat. (2001), and gave no weight to Fitzpatrick's adult age, see § 921.141(6)(g), Fla. Stat. (2001). The trial court did accept and weigh mitigation under the statutory catchall provision, see § 921.141(6)(h), Fla. Stat. (2001), specifically that Fitzpatrick's family background was good (great weight); Fitzpatrick was doing well at his job when the murder in this case was committed (moderate weight); Fitzpatrick had a long history of alcoholism and drug addiction and was apparently making strides to combat it (moderate weight); Fitzpatrick served in the military but was given a general discharge under honorable conditions (no weight because of reason for his discharge); other mental problems, which included an attempted suicide in 1995 and a 1995 diagnosis of an adjustment disorder with depressed mood and situational depression and alcohol and marijuana dependency (moderate weight); and Fitzpatrick has had no relationship with his natural child but established a caring, parental relationship with the children of his girlfriend (great weight).
*527 The trial court also found the following nonstatutory mitigating factors: Fitzpatrick had shown considerate remorse for the death of the victim and appeared genuinely sorry for her death (moderate weight); Fitzpatrick had long-term relationships with at least three women (great weight); the loyalty of Fitzpatrick's friends and family was commendable and showed him as generally a friendly, warm, considerate person (great weight); and the victim was a troubled young woman but there was no evidence that she enticed Fitzpatrick into the acts he committed (given no weight).[11]
The overwhelming aggravation and relative lack of mitigation in the instant case are similar to other cases in which this Court has upheld the death penalty. See Grim v. State, 841 So.2d 455, 464 (Fla.) (holding the death sentence proportional for the first-degree murder and sexual battery conviction where the aggravators included the murder was committed by a person under sentence of imprisonment, the defendant had prior convictions for violent felonies, and the murder was committed while the defendant was engaged in the commission of a sexual battery), cert. denied, 540 U.S. 892, 124 S.Ct. 230, 157 L.Ed.2d 166 (2003); Darling v. State, 808 So.2d 145, 164 (Fla.2002) (holding death sentence proportional where murder was committed while defendant was engaged in the commission of the crime of armed sexual battery and defendant had been previously convicted of felony involving the use or threat of violence to the person); Mansfield v. State, 758 So.2d 636, 647 (Fla.2000) (holding death penalty proportional where HAC and crime committed during the commission of a sexual battery aggravators were found, and five nonstatutory mitigating circumstances were found); Branch v. State, 685 So.2d 1250, 1253 (Fla. 1996) (holding death sentence proportional in a case where the aggravators were murder committed during the course of a sexual battery, prior violent felony, and HAC, and the following nonstatutory mitigating factors were found: remorse, unstable childhood, positive personality traits, and acceptable conduct at trial.) Comparing the circumstances in this action to the cases cited above and other capital cases, we conclude that Fitzpatrick's death sentence is proportionate.

CONCLUSION
Based upon the foregoing, we find no reason to reverse Fitzpatrick's convictions and sentence of death for the murder of Laura Romines. We therefore affirm the judgment and sentence imposed by the circuit court below, and vacate the sentence for the noncapital offense of sexual battery and remand for resentencing after a guidelines scoresheet has been prepared and considered by the trial judge.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
*528 ANSTEAD, J., concurs as to the conviction and concurs in result only as to the sentence.
NOTES
[1] "Steve" was later presumed to be Stephen Kirk, who became a suspect. At trial, the nature of Romines' relationship with Kirk was revealed. Jeff Smedley, a corporal with the sheriff's office, testified that on August 17, 1996, he responded to a call from Water's Edge Apartments. There, he was informed that Romines had been staying with Kirk and Barbara Simler, and was no longer welcome on the premises. Smedley discovered that Kirk met Romines at the motel where he worked as a security guard, and offered Romines a place to stay after she was beaten up by her boyfriend, Joe Galbert. The police eliminated Galbert as a suspect because he was in jail at the time of Romines' stabbing.

A significant amount of investigative evidence exculpated Kirk of Romines' sexual battery and murder. The DNA profile developed from Romines' vaginal swabs was not consistent with Kirk's DNA profile; numerous witnesses, including coworkers and guests at the motel where Kirk was working as a security guard, testified regarding his whereabouts that night; and Kirk's vehicle was processed for possible blood evidence but no results were procured.
[2] This testimony was corroborated by Fitzpatrick's Pro Pizza employers, Deborah Bradford and Eugene Degele, who testified that Fitzpatrick informed them that he had gone that night to a convenience store, picked up a young lady, and taken her to the Sunny Palms Motel. Degele testified that he personally saw Fitzpatrick's Pro Pizza truck in the motel parking lot. At trial, evidence was presented that after the stabbing Degele questioned Fitzpatrick regarding whether the girl who was stabbed was the same girl Fitzpatrick had picked up at the 7-Eleven, and Fitzpatrick denied it was she. However, the next day Fitzpatrick admitted to Degele that the girl he picked up was the one who was found stabbed later that night.
[3] Fairbanks also testified that she and Fitzpatrick went to bed together that night.
[4] Fitzpatrick's claims include: (1) the trial court erred in denying Fitzpatrick's motion for judgment of acquittal on the issue of identity; (2) the trial court erred in denying Fitzpatrick's motion for judgment of acquittal on the issue of sufficiency of the evidence to prove premeditation or that the killing occurred during a sexual battery; (3) the trial court erred in denying Fitzpatrick's motions to suppress statements he made to detectives; (4) the trial court erred in denying Fitzpatrick's motion to suppress DNA results obtained from his blood sample; (5) the trial court erred in permitting the State to introduce the detective's testimony regarding Romines' statements made at the hospital; (6) the trial court erred in not granting a mistrial when Bousquet testified that during the initial interview Fitzpatrick mentioned that he thought he needed an attorney; (7) the trial court erred in denying Fitzpatrick's motions to suppress Howard and Yarborough's identifications of Fitzpatrick; (8) the trial court excluded critical evidence, thereby depriving Ftizpatrick of a fair trial; (9) the trial court committed errors that could have rendered Fitzpatrick's sentence of death unreliable; (10) Florida's death penalty statute is unconstitutional; and (11) the trial court erred in sentencing Fitzpatrick on the noncapital count of sexual battery without the benefit of a sentencing guidelines scoresheet.
[5] The deliberate use of a knife to stab a victim in vital organs supports a finding of premeditation. Romines was stabbed twice in the neck, one wound penetrating the larynx and the other the esophagus, which produced grievous wounds that ultimately caused Romines' death. See Morrison v. State, 818 So.2d 432, 452 (Fla.2002) (holding the jury was amply justified in finding the defendant's intent to kill where there were two major knife wounds to the victim's neck); Perry v. State, 801 So.2d 78, 86 (Fla.2001) (determining that the evidence demonstrated that the victim was stabbed in a deliberate manner to effect death where the stab wounds were to the victim's chest and neck, both areas where an attack would produce grievous wounds); Gore v. State, 784 So.2d 418, 429 (Fla.2001) (holding there was competent, substantial evidence supporting the defendant's conviction for premeditated murder where the evidence demonstrated that the official cause of death was stab wounds severe enough to cause the victim's death).
[6] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[7] Fitzpatrick contends that Romines' hearsay statements when she was in the hospital are unreliable and inadmissible. Even assuming that Romines' statements at the hospital were hearsay, Fitzpatrick overlooks that hearsay statements admitted as impeachment, as opposed to being admitted as substantive evidence, do not need to satisfy the demands of reliability necessary to prove an essential element of a crime or defense. See State v. Smith, 573 So.2d 306, 313 (Fla.1990) ("[E]vidence of a prior inconsistent statement offered as impeachment is admissible only for that purpose unless it is independently admissible on other grounds. Such evidence generally is hearsay and usually does not satisfy the demands of reliability necessary to prove an essential element of a crime or defense. The purpose of admitting evidence of prior inconsistent statements is to test the credibility of a witness whose testimony was harmful to the interest of the impeaching party.") (internal quotation marks and citations omitted). Moreover, the jury was presented with evidence that during the interview with detectives at the hospital Romines was medicated and was in and out of consciousness. The jurors could have assessed on their own the reliability of Romines' statements.

Unlike the Federal Rules of Evidence, Florida has not adopted a "catch-all" reliability exception for the admission of hearsay. See State v. Smith, 573 So.2d 306, 315 (Fla.1990); R.U. v. Dep't of Children & Families, 782 So.2d 1024 (Fla. 4th DCA 2001); Delgado-Santos v. State, 471 So.2d 74, 79 (Fla. 3d DCA 1985).
[8] Indeed, Fitzpatrick did not assert that Yarborough's identification was the product of suggestion.
[9] Testimony was presented by Young that Romines was seen returning to the Sunny Palms Motel with Howard around 3 a.m. With the exception of Young, there was no other testimony presented that Romines was at the Sunny Palms Motel at 3 a.m.
[10] Fairbanks did indicate that Fitzpatrick carried an extra T-shirt in his truck everyday.
[11] The trial court considered and rejected as not established the following mitigating factors: Fitzpatrick had no significant criminal history, see § 921.141(6)(a), Fla. Stat. (2001); Fitzpatrick was under the influence of extreme mental or emotional disturbance, see § 921.141(6)(b), Fla. Stat. (2001); Fitzpatrick's role was minor, see § 921.141(6)(d), Fla. Stat. (2001); Fitzpatrick acted under extreme duress or under the substantial domination of another person, see § 921.141(6)(e), Fla. Stat. (2001); Fitzpatrick's capacity to appreciate the criminality of his act was impaired, see § 921.141(6)(f), Fla. Stat. (2001); evidence that Fitzpatrick was abused, see § 921.141(6)(h), Fla. Stat. (2001); evidence that Fitzpatrick made any charitable or humanitarian contributions, see id.; and Fitzpatrick's religious practices, see id.