362 So.2d 324 (1978)
STATE of Florida, Appellant,
v.
Gary W. SEPULVADO, Appellee.
No. 77-987.
District Court of Appeal of Florida, Second District.
August 2, 1978.
Rehearing Denied September 14, 1978.
*325 Robert L. Shevin, Atty. Gen., Tallahassee, and Mary Jo M. Gallay, Asst. Atty. Gen., Tampa, for appellant.
Jack O. Johnson, Public Defender, and P. Douglas Brinkmeyer, Asst. Public Defender, Bartow, for appellee.
PER CURIAM.
Appellee/defendant Sepulvado and two others were charged with the aggravated battery of Louis Fox. Prior to trial Sepulvado moved to suppress any testimony that Fox might give identifying him as one of Fox's assailants. The trial court granted the motion, holding that Fox could not testify as to his pretrial identification of Sepulvado, nor could he give an in-court identification. The state appeals the trial court's order. We affirm.
Sepulvado's motion alleged that a photo display shown to the victim Fox by the police shortly after he was attacked was impermissibly suggestive, and that it would taint any in-court identification the victim might give. At the hearing on the motion Fox and Detective McManus of the Clearwater Police Department were the only witnesses.
First, Fox was called as a witness for the state. He testified he had been attacked and beaten by three white males as he walked down a well lighted street in downtown Clearwater in the early morning hours of February 3, 1977. He claimed to have gotten a good look at his assailants, even though he acknowledged he had seen them for only "three or four seconds" as they attacked him. He described the color of their hair, and noted that each of the assailants had a full beard.
After he was treated and released from the hospital, Fox went to the police department where he was asked to go through a "photo tray" by Detective McManus. This was about eight hours after the incident. According to Fox the photo tray contained approximately 150 pictures, about 30% of which were black males and the rest white males. Fox said that he went through all the pictures and selected six. After a further viewing of these six, he selected three which he identified as being his assailants. One of these was defendant Sepulvado. *326 During cross-examination Fox specifically denied that Detective McManus had brought him any additional photographs once he began looking at the photo tray.
The defense then called Detective McManus, who gave quite a different version of the photo identification procedure. First, he said the photo tray contained pictures of white males only, and did not contain any pictures of blacks as Fox had testified. The detective also said it had come to his attention while Fox was looking at the photo tray that Sepulvado and two others (all of whom had previous criminal records and photos on file) had been arrested in the vicinity of the assault shortly after it had occurred. The detective stated that he thereupon took photographs of these three men into the room where the victim was going through the photo tray and told the victim, "[W]hen you finish going through those photographs [the ones in the photo tray] would you please look at these photographs [the three file photographs]?" McManus further testified that when he laid the three additional pictures on the desk the victim immediately identified them as his assailants. According to McManus the victim was reasonably certain about two of the subjects but not quite sure about Sepulvado. The reason Fox gave for not being certain that the photo of Sepulvado was the third assailant was that the photo (apparently made some years before) depicted a man with a beard, whereas his third assailant did not have a beard. This, of course, conflicts with Fox's testimony that each of his assailants had a full beard.
When Sepulvado was arrested a new picture was taken of him in which he did not have a beard. This new picture was placed in a photo pack with pictures of four other individuals. This new photo pack was shown to the victim the next day. From this five-picture photo pack Fox was able to positively identify Sepulvado as being the third assailant.
As is obvious, the testimony at the suppression hearing was conflicting in several important respects. While the detective said he had presented the pictures of Sepulvado and his cohorts to Fox separately, Fox denied this and said these pictures had been selected by him from the some 150 photographs in the photo tray. Fox said the photo tray contained pictures of both black and white males; the detective said it contained only pictures of white males. Fox said that all three men who had attacked him were bearded; the detective testified that Fox had told him that Sepulvado did not have a beard. These conflicts made the trial court's decision a hard one.
In Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the Supreme Court noted that almost all identification procedures will be suggestive to some extent. However, such procedures do not become impermissibly suggestive and require suppression unless the "totality of the circumstances" indicate that the identification resulting from the procedure is unreliable. See also Baxter v. State, 355 So.2d 1234, 1237 (Fla. 2d DCA 1978). Justice Powell, writing for the majority in Neil v. Biggers, enumerated five factors relevant to this determination of reliability vel non:
(1) the opportunity of the witness to view the criminal at the time of the crime;
(2) the witness' degree of attention;
(3) the witness' prior description of the criminal;
(4) the level of certainty demonstrated by the witness at the identification procedure; and
(5) the length of time between the crime and the identification procedure.
409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.
After the victim testified in the instant case, the trial judge indicated that the state had made a prima facie showing that the photographic display was presented in an acceptable manner. But, after the police detective testified the court granted defendant's motion to suppress. This demonstrates to us that the court chose to place great credence on the testimony of the police detective. From our review of Detective McManus' testimony we believe that the trial court could have properly concluded that the photo display was suggestive. *327 The pictures of Sepulvado and his two codefendants were presented to the victim in such a way as to pointedly draw Fox's attention to them. Further, when Sepulvado's picture was subsequently presented to the victim in the five-picture photo pack it augmented the suggestiveness of the previous identification procedure.
As noted, mere suggestiveness does not necessitate suppression; it is only procedures that are impermissibly suggestive under all the circumstances of the case that call for suppression.
A trial court's factual conclusions come to this court clothed in a presumption of correctness, and we must make all reasonable inferences and deductions capable of being drawn therefrom in a manner that will sustain the trial court's conclusions. Cameron v. State, 112 So.2d 864, 869 (Fla. 1st DCA 1959). Without recounting the evidence, we think that in holding the identification procedures to be impermissibly suggestive the trial court must have considered the extremely short glimpse the victim had of his assailants at the time of the assault, the trying conditions under which he viewed them, the inconsistency as to whether Sepulvado was bearded, and the victim's unsureness about the identity of Sepulvado at the time of the photographic display. Considering the law enunciated in Neil v. Biggers, and under the standard of review we are mandated to follow, we cannot say the trial court erred in finding the identification procedures were impermissibly suggestive.
Our inquiry, however, does not end here. The trial court in its order not only prohibited any testimony concerning the pretrial photo display, but also prohibited any in-court identification of Sepulvado by the victim. So this additional question must be asked: Even though the pretrial identification procedure was impermissibly suggestive, did the trial court err in suppressing any in-court identification the victim might give? We think not.
In-court identification must be prohibited if the impermissibly suggestive pretrial identification procedure "gives rise to a very substantial likelihood of irreparable mistaken identification." Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968). See also United States v. Sutherland, 428 F.2d 1152, 1155 (5th Cir.1970). The heart of this standard is that a suggestive pretrial identification procedure should not be allowed to taint an in-court identification. Therefore, all the surrounding circumstances must be considered to determine if the witness' in-court identification is grounded upon a basis independent of the suggestive pretrial procedure. Simmons v. United States, supra; Hamilton v. State, 303 So.2d 656 (Fla. 2d DCA 1974); Cribbs v. State, 297 So.2d 335 (Fla.2d DCA), cert. denied, 303 So.2d 335 (Fla. 1974). However, once a trial court determines that a pretrial identification procedure was impermissibly suggestive, it is presumed that any in-court identification will be tainted. It is the state's burden to overcome this presumption by "clear and convincing" evidence. United States v. Sanders, 156 U.S.App.D.C. 210, 215, 479 F.2d 1193, 1198 (1973); United States v. Cook, 464 F.2d 251, 254 (8th Cir.1972); Cribbs v. State, supra, at 336. But see State v. Ciongoli, 313 So.2d 41, 44 (Fla.4th DCA 1975). We do not believe the trial court erred in finding that the state had not carried its burden in the instant case. The only additional evidence presented by the state which the court could have considered on this issue consisted of statements by the victim that he had an independent recollection of his assailants apart from the suggestive photo display. However, the trial court found in its order of suppression that the victim's testimony was "extremely suspect" because of the conflicts with the testimony of the detective. The trial judge obviously placed little weight on his statements. We cannot say the trial court's judgment was in error on this score.
We therefore affirm the order of the trial court suppressing the identification testimony.
GRIMES, C.J., and SCHEB, J., concur.
*328 OTT, Judge, dissenting.
The trial court ruled that the photographic identification procedures were impermissibly suggestive and therefore tainted both the photographic and in-court identification. I disagree.
The first consideration is the scope or appropriateness of our appellate review. It should go without saying that the appellate court should not substitute its conclusions for those of the trial court upon conflicting evidence or facts. It should be equally clear, however, that the appellate court must look to the evidence to determine whether the existing conflicts are on matters relevant and material and whether there is any competent and substantial evidence to support the conclusion reached by the trial court. The appellate tribunal is not foreclosed from review of the trial court's determination but is limited to considering whether the evidence (1) is conflicting on matters material to its decision; (2) supports the ruling or result.
It therefore becomes necessary that the evidence or facts of this case be considered in some detail. The facts were presented to the trial court in a pretrial motion to prohibit any identification of this particular defendant (appellee herein) by the elderly victim of an aggravated assault. The ground for the motion was that the initial police identification procedures were impermissibly suggestive and therefore tainted both the photographic identification and any in-court identification the victim might make.
After being assaulted at about 2:00 a.m. on February 3, 1977 the victim was taken to the hospital. After being treated and released he went to the police department at about 10:00 a.m.  or about 8 hours after the assault. At this time, he was given a photo tray which contained approximately 150 photographs.
The investigating officer and the victim were the only two witnesses to testify at the evidentiary hearing conducted about 3 1/2 months later.
With reference to the photo identification process, the officer testified as follows. The officer started the victim on the tray. About 15 minutes after the victim began looking through that tray, it came to the officer's attention that the appellee and two others had been arrested about the time of the assault in the vicinity of the assault. The officer testified as follows:
A. The report was brought to my attention that the Defendant and two other subjects had been arrested around the time  downtown in the vicinity of downtown Clearwater. Detective Butler brought it to my attention, and with this we called downstairs to Records and we checked to see if any of these subjects had any kind of record, criminal record, with us, which they did.
We obtained photographs of all three subjects. I would say the time period we are speaking of now is probably 20 or 30 minutes by the time the pictures were printed. The pictures came upstairs to me. Mr. Fox [the victim] was still going through the tray, the first tray of pictures. I would say he had gone through maybe 50 or 60 photographs. It was hard for me to say. He was taking them out and setting them on the desk.
I walked into the room, he had a  I had instructed him since they were in alphabetical order to take them out between index cards, the pictures, and go through them one by one, and instead of getting them out of alphabetical order, and he was going through them.
He laid these pictures on the desk that I had obtained through the Records section and I told him, I said, "When you finish going through those photographs, would you please look at these photographs?"
Q. Those were the three that were in your hand?
THE COURT: Those three?
A. Yes, just those three.

*329 Q. Who was those three?
A. The Defendant there and Carpenter and Thomas.
Q. All right.
A. He looked at the pictures of Carpenter  he looked at the pictures of all three of them. Tentatively at that time he made identification of Carpenter and Thomas. He wasn't quite sure about the Defendant Sepulvado. I told him, I instructed him to go back, continue going back through the rest of the photographs. In other words, continue to finish the tray of photographs which he was looking at which he did.
The officer also testified that the photo tray contained pictures of white males only.
The victim testified that the photo tray which he had been given contained photographs of both black and white males. Moreover, the victim testified as follows:
Q... . while looking at these photographs, did [the officer] add any photographs, to your knowledge, to the group of photographs?
A. Not to my knowledge.
Q. How did he ask you to look at the photographs?
A. Just told me to go through them.
Q. Did he specifically point out any individual?
A. No, he didn't. They were all on the desk.
Q. Did he suggest in any way who might have been the person who assaulted you?
A. No, he didn't.
The victim testified that he put about six photographs aside in the process of looking through the entire photo tray. He stated that he subsequently narrowed the six photographs to three  the defendant and his two codefendants.
The officer testified that on the day of the assault, the victim at first hesitated to identify the older file photo of appellant. [The older file photo showed him with a full beard.] The officer testified as follows with reference to the victim's identification:
[H]e [the victim] believed that Sepulvado [the appellee], the picture of him, he believed at that time he had a full beard on the picture, and [the victim] said that if the subject did not have the beard that would be the other subject, the third subject that would have assaulted him.
Q. The third subject who did not have the beard?
A. Right.
On the day of the assault the officer had a new picture made of the appellant following his arrest. When this photo became available it was placed in a photo pack which included pictures of four other individuals. The photo pack was shown to the victim on the day after the assault. The officer testified that the following then occurred:
A. Well, he made positive identification of Sepulvado because of the fact he did not have a beard at the time of the arrest.
In other words, the picture we had obtained through the Records section was several years older, or older, and he did have a full beard.
Q. But the picture he used to identify Mr. Sepulvado did not have a full beard?
A. Right, correct.
At the suppression hearing some 3 1/2 months later the victim stated:
Q. Now, the three suspects that  subjects that you say attacked you that night, did any of the three or all of the three have beards?
A. All three had beards, yes.
Q. Full beards?
A. Full beards.
Q. You are sure of that?
A. That is right.
Q. Would you describe the visual features of the three individuals you say attacked you?
A. Well, one of them had blond hair, blond beard. The other two were the same sort of beard as he has sitting over there. One was dark *330 bearded, brownish. One was a blond beard and the other was a dark beard, five-eleven, and the other one was about six-two.
Q. All right, now, you mentioned "seated over there," you referred to the beard?
A. Yes.
Q. Look at that man. Does he have a beard?
A. Except his beard comes up a little bit now.
Q. What do you mean "now"?
A. In other words, before he had a fuller beard.
Q. What?
A. Before his beard was fuller. Now it is trimmed up.
The victim's testimony with reference to the appellee's beard is somewhat confusing. In an attempt to understand it, I should note the testimony of the officer with reference to the beard of the appellee:
Q... . did Mr. Sepulvado have facial hair?
A. When?
Q. At the time of the arrest, the time of the assault?
THE COURT: At the time of the arrest.
A. At the time of the arrest I believe he had long sideburns like muttonchops.
THE COURT: Like he has now?
A. Yes.
The victim made no statement to the officer or at the hearing that indicated a poor view of this assailant when assaulted or any doubt as to the certainty of his identification of the appellee as that assailant. Neither can I find, in the victim's testimony, any indication of impermissibly suggestive identification procedures.
The trial court concluded, however, that the differences between the testimony of the victim and the officer, together with other weaknesses he thought existed in the victim's testimony, rendered the entire testimony of the victim unworthy of belief.[1] Reasonable men may differ as to the extent of any real conflict and the significance or meaning of such as do exist. The believability or credibility of a witness and the weight to be given certain facts or testimony are normally the exclusive or peculiar function of the jury. If the trial court is saying that such conflicts or weaknesses in the victim's testimony caused it to disbelieve the victim's identification then this constitutes an improper invasion of the jury function.
The trial court was led away from the primary consideration of the identification procedures employed to a consideration of vagaries, inconsistencies and conflicts it believed were demonstrated in the victim's testimony and their bearing on his credibility. Whether or not a jury would choose to disregard the victim's identification because of any meaningful discrepancies in other areas of his testimony and thereby perhaps conclude the state had not carried its burden of proof  including identification  is an entirely different question from that of whether the procedures employed were impermissibly suggestive so as to be the likely cause of the victim's identification of appellee.
Assuming that the trial court chose  as it certainly could  to reject the testimony of the victim we must then consider the question of whether the evidence, exclusive of the victim's testimony, establishes that the identification procedures strongly suggested either a clear danger of misidentification or that the appellee was the assailant.
I am left with the officer's testimony, then, as the only believable or credible testimony as to the procedures employed or the surrounding facts and circumstances.
*331 In this court's recent opinion in Baxter v. State, 355 So.2d 1234, 1237 (Fla.2d DCA 1978) we pointed out that "[d]ue process requires that evidence posing ... a high danger of misidentification be withheld from consideration by the jury." However, we went on to hold:
The degree of danger of misidentification required for exclusion of the evidence is appropriately high so as not to deprive the jury of evidence which is reliable despite the somewhat suggestive procedure and so as to preserve the jury's function to weigh the evidence. Once threshold reliability is established, the accused may employ the traditional methods for testing the weight which the jury should attach to the evidence. The accused may use cross-examination, impeachment, rebuttal testimony, and closing argument to persuade the jury that the identification was mistaken. 355 So.2d at 1237-38.
Also on point is the statement by the Supreme Court of the United States in Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968):
The danger that use of the technique [photo identification] may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error.
In Simmons the following rule was promulgated which is still in effect: "[c]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside ... only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [Emphasis supplied.] 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.[2]
In Baxter we held:
In order to warrant exclusion of evidence of the identification, the identification procedure must have been so suggestive, and the witness' unassisted ability to make the identification so weak, that it may reasonably be said that the witness has lost or abandoned his or her mental image of the offender and has adopted the identity suggested. 355 So.2d at 1238.
In Baxter the court went on to consider the totality of the circumstances:
In making this determination of threshold trustworthiness, the trial judge must consider the totality of the circumstances surrounding the extra-judicial identification. These circumstances will include:
(1) The ability of the witness to perceive and preserve a mental image of the offender;
(2) The method of identification employed;
(3) Accompanying conversation or actions;
(4) The positiveness and manner of the witness' identification;
(5) Whether the witness expressed doubts about the selection or failed to identify the accused. 355 So.2d at 1238.
Neil v. Biggers, supra note 2, also addressed the question "whether under the `totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411. The Court listed the "factors to be considered in evaluating the likelihood of misidentification" as:
(1) The opportunity of the witness to view the criminal at the time of the crime.
(2) The witness' degree of attention.
(3) The accuracy of the witness' prior description of the criminal.

*332 (4) The level of certainty demonstrated by the witness at the confrontation.
(5) The length of time between the crime and the confrontation. 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.
I see nothing in the officer's testimony as to the procedures employed that casts doubt on the threshold trustworthiness of the victim's identification of appellee.
I would hold that the identification procedure herein was not impermissibly suggestive according to the rules as promulgated in Simmons and interpreted by this court in Baxter.
Support is also found in other recent decisions of the United States Supreme Court, the lower federal courts and the courts of Florida. A close examination of the facts of these cases and the courts' application of the Simmons rule to those various factual situations, indicates that the facts in the instant case fall short of demonstrating the "very substantial likelihood of misidentification" necessary to mandate the court taking the case from the jury.
In four recent cases identification procedures were held to be permissible.
(1) Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). The Court held admissible an in-court identification by a witness who had first observed his assailant in the headlights of a passing car. As in our case, the initial identification was at night. The witness in Coleman testified that he observed his assailant "face to face" and that he "got a real good look at him."[3]
(2) In Simmons, supra, the Court stated that the circumstances of the case created "little chance that the procedure utilized led to misidentification of Simmons." 390 U.S. at 385, 88 S.Ct. at 971, 19 L.Ed.2d at 1254. The Court pointed out that the witnesses "were shown the photographs only a day later, while their memories were still fresh." 390 U.S. at 385, 88 S.Ct. at 972, 19 L.Ed.2d at 1254. In our case, the victim was shown the file photographs and photo tray on the same day as the assault and was shown the photo pack on the day after that.
(3) In Neil, supra, the Court held that even though the show-up procedure utilized was unnecessarily suggestive, there was, under the totality of the circumstances, no substantial likelihood of misidentification. This was so, even though there had been a seven month lapse between the alleged rape and the confrontation. In our case, the identification was made with much greater speed.
(4) In United States v. Allen, 497 F.2d 160 (5th Cir.1974) the victim  after consuming "eight or ten beers"  was lured into a house by a female where he was hit over the head, and then driven to a remote area where he was stabbed by two males. By his own testimony, the victim's initial observation of his two assailants whose pictures he later identified was marred by poor lighting conditions. The court upheld the identification notwithstanding the drinking, the blow to the head [received before he viewed his assailants] and the poor lighting conditions. Of course, in the instant case the victim had nothing to drink and was able to view his assailants before being assaulted in any way.
In two other cases identification procedures were held to have violated due process.
(1) In Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) the witness failed to identify the defendant despite a suggestive line-up. At an ensuing show-up the witness could make only a tentative identification. Ultimately, at a second line-up, in which the defendant was the only person who also appeared in the first line-up, the witness was able to muster a definite identification. All of the identifications *333 were held inadmissible, the Court observing that the identification was "all but inevitable" under the circumstances. 394 U.S. at 443, 89 S.Ct. at 1129, 22 L.Ed.2d at 406.
(2) In Hamilton v. State, 303 So.2d 656 (Fla.2d DCA 1974) this court held that a photographic identification of the defendant was impermissibly suggestive and tainted a later in-court identification. In that case, the victim picked appellant's photo out of a photo pack of five. However, four days later, she expressed doubt and asked to see the photos again. After narrowing the five photos down to two, she selected a picture of the other person. A policeman there present then said that she had selected the right photo the first time and suggested she try again.
In both Foster and Hamilton the facts were so strong (in contrast to the instant case) that there was no question that there was an impermissibly suggestive police procedure which tainted the identification.
I would reverse the order of the trial court suppressing the identification testimony and remand for further proceedings accordingly.
NOTES
[1] In its order granting the motion to suppress the lower court stated:

[T]he Court being of the opinion that the photographic display procedures were so impermissibly suggestive as to fatally taint the victim's identification of the accused despite the victim's assertion of an independent recollection, the victim's testimony being extremely suspect in that he denied the suggestive procedures followed and had only a limited opportunity to identify his assailants under difficult circumstances. [Emphasis supplied.]
[2] Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401, 410 (1972) added a slight qualification to the rule. The court in Neil stated "while the phrase ["a very substantial likelihood of irreparable misidentification"] was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggested out-of-court identification, with the deletion of `irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself."
[3] In the instant case the victim testified that the area of the assault was lighted "just like daytime." Moreover, the victim testified at the hearing as follows:

Q. Did you have an opportunity when you turned around prior to the assault to look at the three individuals who assaulted you?
A. [The victim] I certainly did.
Q. Did you get a good look at that time?
A. [The victim] I sure did.