# Supreme Court of Florida

_____

No. SC13-1652
_____

**LERONNIE LEE WALTON,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

[December 1, 2016]

PERRY, J.

This case is before the Court for review of the First District Court of Appeal's decision in Walton v. State, 106 So. 3d 522 (Fla. 1st DCA 2013). The First District held that minimum mandatory sentences under section 775.087, Florida Statutes—the 10-20-Life statute—must run consecutively when the sentences arise from a single criminal episode, irrespective of whether the defendant fires a firearm or only carries or displays it. Id. at 528. The First District certified conflict with Irizarry v. State, 946 So. 2d 555 (Fla. 5th DCA

2006).  We have jurisdiction.  See art. V, § 3(b)(4), Fla. Const.  For the reasons discussed below, we quash the First District's decision and remand for a new trial.

**FACTS**

On September 10, 2008, Kristina Salas and her sister, Karine Nalbandyan, placed their children into a parked car.  As Salas leaned into the car, a man ambushed her, held a gun to her head, and demanded that she give him her purse or be killed.  The two struggled over the purse until the gun fell to the ground.  Then the man picked up his gun, went to the other side of the car, and demanded Nalbandyan's purse.

Detectives Shannon Fusco and James Johnston of the Jacksonville Sheriff's Office were investigating a theft nearby when they came upon the scene.  Detective Fusco identified herself as a law enforcement officer and ordered the man to put his gun down.  The man and another man at the scene responded by shooting at the detectives.  Two eyewitnesses, Lashonda Jackson and her teenage daughter, Antoinette Gillan, observed the crime.  Jackson later identified Leronnie Lee Walton as one of the men shooting at the detectives.

Almost two months after the crime, Detective Venosh and Detective Padgett interviewed Gillan.  Detective Padgett instructed Gillan to look at a two photo arrays and identify anyone that she recognized in connection with the shooting.  Gillan was unable to identify anyone in the first array.  She then examined the

second set of photographs and initially said she was not sure if she recognized anyone. Detective Padgett responded, "I noticed you moved that one [photo] and kind of looked back a little bit or something when you looked at that one." Gillan replied that a man in one photo in the second array looked familiar. Detective Padgett explained to Gillan the importance of making an identification, noting how dangerous the shooters were and that her mother could have been killed. Detective Padgett then said, "I'm not trying to point you towards anybody, it's just that you really did look—I saw the look on your face when you looked at that one right there." Afterwards, Gillan identified the photo of Walton as a depiction of the man she saw shooting at law enforcement officers.

When the State attempted to call Gillan as a witness during Walton's jury trial, Walton moved to suppress Gillan's identification as impermissibly suggestive and likely unreliable. The trial court denied Walton's motion to suppress.

Ultimately, Walton was convicted of two counts of attempted murder of a law enforcement officer with possession and discharge of a firearm during commission of the attempted murder, and two counts of attempted armed robbery with possession of a firearm during the commission of the attempted armed robbery. After vacating the initial sentencing order, the trial court resentenced Walton to two terms of thirty years for the attempted murders with mandatory minimum sentences of twenty years and two terms of fifteen years for the

attempted armed robberies with mandatory minimum sentences of ten years. The trial court ordered that all sentences and mandatory minimums run consecutively. Walton was not present at his resentencing.

On appeal to the First District, Walton argued that the trial court erred by imposing consecutive mandatory minimum sentences. While the First District reversed Walton's sentences because he was not present at resentencing, the First District concluded that any mandatory minimum sentence required by the 10-20-Life statute must be imposed consecutively to any other sentence imposed for any other felony regardless of whether the defendant fires a gun or only carries or displays it. Walton, 106 So. 2d at 528. Walton petitioned this Court for review.

## ANALYSIS

Walton has identified three errors that merit quashing the First District's decision. The trial court erred in (1) concluding that section 775.087, Florida Statutes—the 10-20-Life statute—required Walton's sentences to be imposed consecutively, (2) failing to instruct the jury on attempted manslaughter, and (3) admitting improper identification testimony. For the following reasons, we quash the First District's decision and remand with instructions to return the case to the circuit court for a new trial.

First, the First District erred in concluding that the 10-20-Life statute required Walton's sentences to be imposed consecutively, irrespective of whether

- 4 -

Walton fired, carried, or displayed a firearm. We recently addressed this issue in Williams v. State, 186 So. 3d 989 (Fla. 2016). We reiterated that "consecutive sentencing of mandatory minimum imprisonment terms for multiple firearm offenses is impermissible if the offenses arose from the same criminal episode and a firearm was merely possessed but not discharged." Id. at 993. Accordingly, we quash the First District's opinion to the extent it is inconsistent with Williams.

Second, Walton is entitled to a new trial because the trial court committed fundamental error by failing to instruct the jury on attempted manslaughter as a lesser included offense of second-degree murder. This issue is a pure question of law and is therefore subject to de novo review. Griffin v. State, 160 So. 3d 63, 67 (Fla. 2015) (citing Puglisi v. State, 112 So. 3d 1196, 1204 (Fla. 2013)).

"Necessarily lesser included offenses are those offenses in which the statutory elements of the lesser included offense are always subsumed within those of the charged offense." Sanders v. State, 944 So. 2d 203, 206 (Fla. 2006). "The law requires that an instruction be given for any lesser offense all the elements of which are alleged in the accusatory pleadings and supported by the evidence adduced at trial." State v. Weller, 590 So. 2d 923, 926 (Fla. 1991). "The trial judge has no discretion in whether to instruct the jury on a necessarily lesser included offense. Once the judge determines that the offense is a necessarily lesser

included offense, an instruction must be given." Montgomery v. State, 39 So. 3d 252, 259 (Fla. 2010) (quoting State v. Wimberly, 498 So. 2d 929, 932 (Fla. 1986)).

Attempted manslaughter by act is a necessarily lesser included offense of attempted second-degree murder because attempted second-degree murder contains all of the elements of the crime of attempted manslaughter by act. Compare § 782.04(2), Fla. Stat. (2008) (defining second-degree murder as an "unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual"), with § 782.07(1), Fla. Stat. (2008) (defining manslaughter as a "killing of a human being by the act . . . of another, without lawful justification . . . and in cases in which such killing shall not be excusable homicide or murder"); see also Montgomery, 39 So. 3d at 259 (noting that "second-degree murder was only one step removed from the necessarily lesser included offense of manslaughter"). Here, Walton was charged with second-degree murder, with a sentencing enhancement because the victim was a law enforcement officer. See § 782.04(2), Fla. Stat. (2008) (attempted second-degree murder); § 782.065(2), Fla. Stat. (2008) (sentencing enhancement for law enforcement victim). Accordingly, the trial court was required to give an instruction for attempted manslaughter by act when it gave the instruction for attempted second-degree murder.

Not only did the trial court err by failing to give the instruction for attempted manslaughter by act, but its failure constituted fundamental error. Fundamental error occurs "only when the omission is pertinent or material to what the jury must consider in order to convict." Griffin v. State, 160 So. 3d 63, 66 (Fla. 2015); see also Montgomery, 39 So. 3d at 258 (same). We have repeatedly held that the failure to correctly instruct the jury on a necessarily lesser included offense constitutes fundamental error. See, e.g., Williams v. State, 123 So. 3d 23, 27 (Fla. 2013) (holding that fundamental error occurs when the trial judge gives an incorrect instruction on the necessarily lesser included offense of attempted manslaughter for a defendant convicted of attempted second-degree murder); Montgomery, 39 So. 3d at 259 (same). If giving an incorrect instruction on a necessarily lesser included offense constitutes fundamental error, then a fortiori giving no instruction at all likewise constitutes fundamental error. Accordingly, Walton is entitled to a new trial with correct instructions for the necessarily lesser included offense of attempted manslaughter by act.

Even if the faulty jury instructions did not constitute a fundamental error, we would be forced to quash the district court's decision because Detective Padgett employed an impermissibly suggestive photo array process. During the trial, Walton argued that Gillan's identification of Walton as the perpetrator should be

excluded because the photo identification procedure was impermissibly suggestive and created a substantial likelihood of misidentification. We agree.

Since a trial court's ruling on a motion to suppress is a mixed question of law and fact that determines constitutional rights, we employ a two-step standard of review:

> In reviewing a trial court's ruling on a motion to suppress, appellate courts must accord a presumption of correctness to the trial court's determination of the historical facts, but must independently review mixed questions of law and fact that ultimately determine the constitutional issues arising in the context of the Fourth Amendment. See Connor v. State, 803 So. 2d 598, 608 (Fla. 2001); Stephens v. State, 748 So. 2d 1028, 1032 (Fla. 1999); Albritton v. State, 769 So. 2d 438 (Fla. 2d DCA 2000).

Moody v. State, 842 So. 2d 754, 758 (Fla. 2003).

The primary evil to be avoided in the introduction of an out-of-court identification is a very substantial likelihood of misidentification. An impermissibly suggestive identification procedure is one that creates the danger of misidentification so great that it violates due process. Simmons v. United States, 390 U.S. 377, 386 (1968). The test promulgated by the United States Supreme Court and adopted by this Court is twofold: (1) did the police employ an unnecessarily suggestive procedure in obtaining an out-of-court identification; and (2) if so, considering the totality of the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification. Simmons v. State, 934 So. 2d 1100, 1118 (Fla. 2006). In this case, Gillan's identification

should have been excluded because the method employed by the detective was impermissibly suggestive and gave rise to a likelihood of misidentification.

The first prong of the analysis, the presence of a suggestive identification procedure, is satisfied because Detective Padgett repeatedly called Gillan's attention to the picture depicting Walton. The identification procedure in this case is analogous to the procedure employed in State v. Sepulvado, 362 So. 2d 324, 326 (Fla. 2d DCA 1978). In Sepulvado, a detective testified that he asked the victim to look at a photo array containing 150 pictures of white males. Id. at 325. While the victim was still examining the photo array, the detective brought three additional photographs into the interrogation room, all three depicting black males. Id. at 326. After the victim reviewed the 150 pictures, the detective asked the victim to look at the three additional pictures. Id. The victim identified all three men, including the defendant, as his assailants. Id. The Second District held that because the detective called the victim's attention to the defendant's picture, the procedure was impermissibly suggestive. Id. Similarly, in this case, Detective Padgett called Gillan's attention to the picture without her having given any indication that she recognized Walton. By repeatedly asking Gillan questions about Walton's photograph, Detective Padgett influenced Gillan to pay special attention to that photo. As in Sepulvado, we conclude that the identification procedure employed in this case was suggestive.

- 9 -

We also conclude that considering the totality of the circumstances, the suggestive identification procedure gave rise to a substantial likelihood of irreparable misidentification. To reach that conclusion, we consider the five factors set out in Neil v. Biggers, 409 U.S. 188 (1972): (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Grant v. State, 390 So. 2d 341, 343 (Fla. 1980) (citing Biggers, 409 U.S. at 199-200).

As to the first factor, the witness's opportunity to view the criminal at the time of the crime, we conclude that Gillan did not have a meaningful opportunity to see Walton commit the crime. Gillan witnessed the incident from behind a dumpster, where she managed to "peek" and see two men shooting at law enforcement officers. Gillan provided very little detail of what she witnessed, suggesting that her effort to hide from the gunfire may have understandably thwarted her opportunity to see the incident.

As to the second factor, the witness's degree of attention, Gillan's hazy memory of the incident does not give us confidence in her identification of Walton. During her interview, Gillan stated that one of the men had short dreadlocks and

- 10 -

that there were two men shooting at law enforcement officers. However, at trial, Gillan was still unsure if one of the suspects had dreadlocks.

The third factor, the accuracy of the witness's prior description of the assailant, does not weigh in favor of admitting the identification because it is unclear what Gillan's prior description of the defendant was. Gillan testified that after the shooting, she spoke to police regarding what she witnessed. The record is unclear as to what exactly she told law enforcement officers prior to identifying Walton. As such, we give little weight to this factor. The State points out that at her deposition and at Walton's trial, Gillan maintained that Walton was one of the men she saw shooting at law enforcement officers. However, that fact is irrelevant because her deposition and her trial testimony occurred after the detective improperly influenced her identification of Walton.

As to the fourth factor, the level of certainty demonstrated by the witness at the confrontation, we conclude that Gillan did not display a high level of certainty when she identified Walton. Gillan initially said she was "not sure" if she recognized anyone. Further, Gillan testified at trial that she was unsure of her identification of Walton.

As to the fifth factor, we conclude that the time between the shooting and the identification was too great for Gillan's identification to be deemed reliable. Almost two months had passed since the shooting and the date Gillan made the

identification of Walton.  See Fitzpatrick v. State, 900 So. 2d 495, 518 (Fla. 2005) (holding that a three-day gap between the observed event and the witness's identification contributed to the unreliability of the identification).

In short, none of the five factors gives us confidence that Gillan accurately identified Walton as the assailant she saw on September 10, 2008.  To the contrary, the faulty photo array procedure gave rise to a substantial likelihood of an irreparable misidentification.  See Simmons, 934 So. 2d at 1118.  Accordingly, we reverse Walton's convictions because they were tainted by inappropriate evidence of eyewitness identification.

## CONCLUSION

For the foregoing reasons, we quash the First District's decision in Walton to the extent it is inconsistent with this opinion.  We also remand this case to the First District with instructions to return this case to the circuit court for a new trial, at which Walton is entitled to a jury instruction for attempted manslaughter by act and at which the State may not present the tainted evidence of Gillan's eyewitness identification.

It is so ordered.

LABARGA, C.J., and PARIENTE, and QUINCE, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., dissents with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

I would approve the result reached by the en banc decision of the First District on review and disapprove the decision of the Fifth District in Irizarry v. State, 946 So. 2d 555 (Fla. 5th DCA 2006). I therefore disagree with the majority with respect to the sentencing issue—the basis for our certified conflict jurisdiction. I would conclude that consecutive mandatory minimum sentences were properly imposed not only for Walton's attempted murder offenses, which involved the firing of a firearm, but also for his attempted armed robbery offenses, which did not involve the firing of a firearm. I also disagree with the majority regarding the two grounds on which a new trial is mandated.

## I.

On the sentencing issue, the majority has missed the mark entirely. At the outset, the majority goes astray by misstating the issue presented by Walton. The majority says that one of the errors identified by Walton was the trial court's conclusion "that section 775.087, Florida Statutes—the 10-20-Life statute—required Walton's sentences to be imposed consecutively." Majority op. at 4. But Walton made no such argument. Rather than arguing that consecutive sentences were not required, Walton argued that consecutive sentences were not authorized: "Mr. Walton contends that the First District's interpretation of the 10-20-Life statute as authorizing consecutive mandatory minimum sentences on all sentences

imposed under section 775.087(2) is incorrect . . . ." Petitioner's Initial Brief on the Merits at 25, Walton v. State, No. SC13-1652 (Fla. May 23, 2014). Walton stated that "the holding by the First District was that consecutive mandatory minimums were authorized . . . not that they were mandatory." Petitioner's Reply Brief on the Merits at 3, Walton v. State, No. SC13-1652 (Fla. Aug. 15, 2014). Although the State argued that the statute required the sentences to be imposed consecutively and there is language in the First District's opinion that would support the conclusion that the sentences were required to be imposed consecutively, that is not the question put at issue in the case by Walton.

On the sentencing issue actually presented by Walton, I agree with the result reached by the First District. I would conclude that nothing in the 10-20-Life statute precludes the exercise of the discretion of sentencing judges to impose consecutive mandatory minimum sentences. Section 775.021(4)(a) unequivocally provides:

> Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense; and the sentencing judge may order the sentences to be served concurrently or consecutively.

§ 775.021(4)(a), Fla. Stat. (2010). The statute does not distinguish between mandatory minimum sentences and other sentences. I would recede from our cases that deny sentencing judges the discretion expressly granted by the statute.

- 14 -

In Palmer v. State, 438 So. 2d 1, 3 (Fla. 1983), we addressed consecutive sentences imposed under subsection 775.087(2), Florida Statutes (1981), which we explained "provide[d] that any person who had in his possession a firearm during the commission of certain specified felonies, including robbery, shall be sentenced to a minimum term of imprisonment of three calendar years." We concluded that notwithstanding subsection 775.021(4), Florida Statutes (1981), which—like the current statute—granted sentencing judges the authority to impose consecutive sentences for offenses arising from a single criminal transaction or episode, "the trial court erred in imposing three-year mandatory minimums on each of thirteen consecutive sentences, for a total of thirty-nine years without eligibility for parole." Palmer, 438 So. 2d at 3. We observed that Palmer "was sentenced to thirty-nine years, without eligibility for parole, based on a statute expressly authorizing denial of eligibility for parole for only three years." Id. Relying on the legislative authorization of parole, we reasoned as follows:

> We do not believe the legislature intended such a result as the sentence under review here when it added subsection (4) to section 775.021. In any event we are unwilling to construe these two statutes in such a way as to allow the imposition of any sentence without eligibility for parole greater than three calendar years.

Id. at 3-4. Of course, the Legislature long ago abolished parole for noncapital felonies. See ch. 83-87, § 2, Laws of Fla.

- 15 -

Another change in the statutory framework made after <u>Palmer</u> was decided also points to the conclusion that the reasoning of <u>Palmer</u> is no longer applicable. That change was made in 1999 when the Legislature amended section 775.087 by adding the language in subsection (2)(d) stating that "[i]t is the intent of the Legislature that offenders who actually possess, carry, display, use, threaten to use, or attempt to use firearms or destructive devices be <u>punished to the fullest extent of the law</u> . . . ." Ch. 99-12, § 1, at 540, Laws of Fla. (emphasis added). Similar language in the prison releasee reoffender statute was central to the reasoning underlying our holding in <u>Cotto v. State</u>, 139 So. 3d 283, 290 (Fla. 2014), that it was permissible for the trial court to impose concurrent HFO sentences to run consecutively to the defendant's PRR sentence.

In <u>Cotto</u> we stated:

> The PRR statute specifically states that the legislative intent is to punish those eligible for PRR sentencing <u>to the fullest extent of the law</u>. See § 775.082(9)(d)1., Fla. Stat. (2002). This express statement of intent demonstrates that the discretion of trial courts to impose consecutive sentences is not in any way limited by the PRR statute.

139 So. 3d at 289. We therefore recognized that "the intent behind the PRR provision is to provide for <u>maximum sentencing</u> within the sentencing statute"— that is, eligibility for consecutive sentences. <u>Id.</u> at 290. Rejecting <u>Palmer</u> as a guide, the <u>Cotto</u> Court observed that the "statute[] at issue in <u>Palmer</u> . . . did not include a similar statement of legislative intent." <u>Id.</u> at 289-90. It necessarily

- 16 -

follows that the addition to the 10-20-Life statute of the language expressing the legislative intent to punish "to the fullest extent of the law" decisively undermines the reasoning of Palmer, which was based on the Court's understanding of legislative intent. Just as with the PRR statute, under the 10-20-Life statute the "express statement of intent" to punish to the fullest extent of the law "demonstrates that the discretion of trial courts to impose consecutive sentences is not in any way limited."

I therefore would recede from Palmer. I also would recede from State v. Christian, 692 So. 2d 889 (Fla. 1997) (holding that for offenses arising from a single episode, consecutive mandatory minimum sentences are permissible where the violations of the mandatory minimum statutes cause injury to multiple victims, or multiple injuries to one victim), State v. Thomas, 487 So. 2d 1043, 1044 (Fla. 1986) (holding that consecutive firearm mandatory minimum sentences are permissible when a single incident involves shootings that are "two separate and distinct offenses involving two separate and distinct victims"), State v. Sousa, 903 So. 2d 923 (Fla. 2005) (holding that 1999 amendment to section 775.087(2)(d) did not preclude consecutive mandatory minimum sentences for shootings of multiple victims within a single criminal episode), and Williams v. State, 186 So. 3d 989 (Fla. 2016) (holding that if multiple firearm offenses are committed contemporaneously, during which time multiple victims are shot at, then

- 17 -

consecutive mandatory minimum sentencing is permissible but not mandatory), to the extent they hold that special circumstances are necessary to justify the imposition of 10-20-Life mandatory minimum sentences consecutively to one another.

Aside from Palmer's long-outdated reliance on the legislative authorization of parole, there is no arguable textual basis in the statutes for the limitations we have imposed on the unfettered discretion to impose consecutive sentences that is expressly granted by section 775.021(4)(a). The only basis for those limitations was a judicial implication that the Legislature could not have intended to permit— at least in some circumstances—the harsh punishment that would result from consecutive mandatory minimum sentences. The distinction we have made based on whether a firearm was fired is totally untethered from anything in the text of the relevant statutes. Under the statutory provisions, the firing of a firearm is relevant only to the length of the mandatory minimum sentence. There simply is no basis for saying that the statutory provisions authorize the stacking of mandatory minimum sentences only when a firearm is fired. And the judicial implication of a legislative intent not to impose the harsh punishment resulting from the stacking of mandatory minimum sentences absent the firing of a firearm is conclusively defeated by the Legislature's express statement of its intent in section 775.087(2)(d) that all "offenders who actually possess, carry, display, use, threaten

to use, or attempt to use" a firearm are to "be punished to the fullest extent of the law." As Cotto recognizes, such a statement of legislative intent "demonstrates that the discretion of trial courts to impose consecutive sentences is not in any way limited." 139 So. 3d at 289. All of Walton's mandatory minimum sentences were properly imposed consecutively.

## II.

Because no rational juror could have concluded that the evidence supported a conviction for attempted manslaughter, I would reject Walton's claim that it was fundamental error not to instruct the jury on that crime. See Haygood v. State, 109 So. 3d 735, 749 (Fla. 2013) (Canady, J., dissenting) ("In any case where the evidence supports the jury's verdict of guilt on the charged offense and no error was made in the instructions regarding that offense, it is hard to fathom how an error in an instruction regarding a lesser included offense would properly be considered an error without which 'a verdict of guilt could not have been obtained.' But the departure from our general doctrine of fundamental error is magnified where—as in the majority's decision here—an error in an instruction regarding a lesser included offense is declared fundamental even though there is no evidentiary basis for an instruction on that offense.")

## III.

I would conclude that the trial court did not err in determining that the photo identification procedure challenged by Walton was not impermissibly suggestive and therefore denying exclusion of Antoinette Gillan's out-of-court identification of Walton from trial. Walton does not challenge the photo set from which Gillan identified Walton, but claims that Detective Padgett, who presented the photo set to Gillan, improperly pressured her to identify Walton. The record does not support this claim.

On the day of the shooting, fourteen-year-old Gillan and her mother, Lashonda Jackson, returned to their apartment complex—where the shooting took place—from a trip to the laundromat shortly before the shooting. As they entered the complex, Gillan observed three black males in their twenties standing near an orange car watching them. Once inside their apartment, Jackson asked Gillan to take out the trash. As Gillan was walking to the Dumpster, she saw Detectives Fusco and Johnston on foot in the complex. As she went around the back of one of the buildings, she saw one of the black males—whom she had seen earlier—holding a gun to Kristina Salas's head. When Gillan heard shooting, she took cover behind the Dumpster but was able to peek out and see what was happening. She saw one of the other black males in the backseat of the orange car and the third black male—later identified as Walton—kneeling next to the passenger side of the orange car with a black gun in his hand. She saw both of the black males who

were outside of the car shooting at the two detectives.[1]  She then saw the black male who had been holding the gun to Salas's head run back to the orange car while continuing to shoot at the detectives and get into the driver's side, Walton get into the passenger's side, and the car speed off as Walton continued to shoot out of the passenger side window.  Gillan retreated back behind the Dumpster when the orange car drove past her and one of the men noticed her watching.

After the shooting, Gillan was reported as a missing juvenile or a runaway. When her whereabouts became known several weeks later, she was brought to the police station to see if she could identify any of the men involved in the shooting from either of two photo sets.  Detective Padgett and Detective Venosh met with Gillan in an interview room to take her statement and show her the photo sets. Each photo set was comprised of six photographs.  The six photos in each set were stacked one on top of the next.  The photos were shuffled so that Detective Padgett would not have a predetermined notion of when the witness was viewing the suspect's photo, but in neither set was the suspect's photo placed on top of the pile.

---

1. The record is unclear concerning the distance from which Gillan observed Walton when she was entering the apartment complex or during the shooting.  She was asked during her testimony at trial about the distance she was from Walton (presumably during the shooting) and she stated that it was approximately the distance between her and the defense attorney questioning her. She testified that she was further away from the other shooter, whom she could not identify.

The entire meeting was audio recorded and the portion relating to the photo sets was played in open court during the hearing on Walton's pretrial motion to suppress Gillan's identification:

UNKNOWN MALE VOICE [Detective]: The guys that did the shooting, the bad guys that we talked about, he might be in here and he might not be in here. I want you to look at all six pictures and see if you see him in there, one or the other of the bad guys.

And we've got two sets of pictures we want you to look at for the two guys, okay? Take a look at these and see what you see. You don't have to pick anybody. If you're not sure, you're not sure, okay? Take a look at them one at a time and see what you see.

UNKNOWN FEMALE VOICE [Gillan]: (Inaudible.)

UNKNOWN MALE VOICE: Go ahead and look at all six of them, okay, and look at that one real close and then set that one to the side if you want and then keep going, but go ahead and look at all six of them real close.

It's kind of tough, isn't it? You can't be sure? It's better to not be sure than not pick anybody. Don't pick anybody that was not with the - - don't pick anybody that was not involved. Any of them jump out at you at all? Other than that one, any other ones jump out at you? Okay. All right.

Now, just so I'm - - just so I'm straight, because I'm going to have to write a report, this guy, you know, this group of guys would have been which guy, the guy tussling with the lady for the purse or the guy standing at the car?

UNKNOWN FEMALE VOICE: The guy (inaudible).

UNKNOWN MALE VOICE: So the one standing at the car, did he have longer hair than the other one?

UNKNOWN FEMALE VOICE: He had a - - I think he had a hat on.

UNKNOWN MALE VOICE: He had a hat on. Okay. All right. The same thing, six different pictures. Okay. Look at these and see if you recognize anybody in this set of pictures that was out there that day

involved in the shooting with the police.  And the same thing; if you can't be sure, you can't be sure, but go ahead and have a look at all six of them real close, okay.

UNKNOWN FEMALE VOICE:  I'm not sure.

UNKNOWN MALE VOICE:  Any of those guys kind of standing out to you?  I noticed you moved that one and kind of looked back a little bit or something when you looked at that one.  Did it jump out at you or something, look familiar to you or what, what about it?

UNKNOWN FEMALE VOICE:  It looked familiar.

UNKNOWN MALE VOICE:  Like familiar like one of those guys out there that day or?

UNKNOWN FEMALE VOICE:  Uh-huh.

UNKNOWN MALE VOICE:  Yeah.  Which one was it that was (inaudible)?  Which one was it?  It wasn't that one.  It wasn't that one.  Was it that one right there?

Listen, I sense that - - I sense that you kind of do not want to identify these guys, okay, you don't want to get them in some trouble or you don't want to - - you don't want to, you know, get real deep involved in this thing, okay, but this is real important and those guys could have hurt somebody and they could have hurt you and they could have hurt the policeman, okay, so it's real important for you, if you see these guys in there, to pick them out, okay.

I'm not trying to point you towards anybody, it's just that you really did look - - I saw the look on your face when you looked at that one right there.  So I'm sensing that you might be trying to shy away from helping me out here, and I really need you to help me, okay.

Is that one of them right there?  You sure?  Okay.  Did see [sic] the other one in these?  Are you sure?

UNKNOWN FEMALE VOICE:  Yes.

UNKNOWN MALE VOICE:  Okay.  Which one was this guy right here?

UNKNOWN FEMALE VOICE:  The one that was kneeling - -

UNKNOWN MALE VOICE:  The one kneeling.

UNKNOWN FEMALE VOICE:  - - by the car.

UNKNOWN MALE VOICE:  There was one kneeling down by the car?

UNKNOWN FEMALE VOICE:  Yes.

UNKNOWN MALE VOICE:  Okay.  And when you were - - when you were, I guess, whenever you went to the dumpster, that's when you saw his face?  You kind of looked at him.  Did he say anything to you or speak to you at all?

UNKNOWN FEMALE VOICE:  No, sir.

UNKNOWN MALE VOICE:  He didn't see you at all.  Okay.  Okay.  Sign this picture right here down at the bottom.  Okay.

UNKNOWN FEMALE VOICE:  Are you going to show it to him?

In order to clarify what was happening in the interview room during the audio recording, Detective Padgett testified at the hearing on the motion to suppress, and the parties also stipulated to the use of Gillan's deposition testimony at the hearing. Gillan and Padgett also testified at trial.

Both Padgett and Gillan testified that Gillan was unable to identify a suspect in the first photo set and she was then shown a second set, which contained Walton's photo.  Padgett testified that it is his practice to watch witnesses as they look through a photo set in order to see if they have any kind of reaction to any of the photos.  As he watched Gillan look through the second set of photos, he saw that upon viewing one of the photos, her eyes got big and she moved back as if she

was scared of the photo. Padgett said that Gillan's reaction was so obvious that Detective Venosh also recognized it.

After Gillan finished looking at all the photos in the second set and said that she was "not sure," Padgett drew her attention to the reaction she had to one of the photographs. Padgett testified that he decided to follow up and ask about the reaction because Gillan was very timid and he thought that she might be afraid that if she made an identification she would have to come to court and face the person she identified. Padgett never told Gillan that the photograph she identified was one of the suspects in the case, and Gillan was able to explain Walton's role in the robbery and shooting from her own recollection.

Gillan testified that she was not able to identify anyone in the first photo set, but when she viewed the second set, she immediately recognized Walton in one of the photos as the man who had been kneeling down on the passenger side of the orange car and she reacted to the photo. Gillan said that despite the fact that she recognized Walton immediately, she first told Detective Padgett that she was not sure if she recognized anybody, but she then admitted that she recognized Walton as the shooter on the passenger side of the orange car. Gillan said that Detective Padgett never suggested that she pick a particular photograph but told her that she did not have to pick any of the photographs. And after she made her identification, Detective Padgett never told her that she picked "the right guy."

The due process limitation on identification procedures involves a two-pronged test. We have "explained that the test for suppression of an out-of-court identification is two-fold: '(1) whether the police used an unnecessarily suggestive procedure to obtain the out-of-court identification; and (2) if so, considering all the circumstances, whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.' " Fitzpatrick v. State, 900 So. 2d 495, 517-18 (Fla. 2005) (quoting Rimmer v. State, 825 So. 2d 304, 316 (Fla. 2002)). Two of Florida's district courts have further explained that

> [i]n order to warrant exclusion of evidence of the identification, the identification procedure[] must have been so suggestive, and the witness' unassisted ability to make the identification so weak, that it may reasonably be said that the witness has lost or abandoned his or her mental image of the offender and has adopted the identity suggested.

Johnson v. State, 717 So. 2d 1057, 1063 (Fla. 1st DCA 1998) (quoting Baxter v. State, 355 So. 2d 1234, 1238 (Fla. 2d DCA 1978)), approved, 761 So. 2d 318 (Fla. 2000); Baxter, 355 So. 2d at 1238 (citing Simmons v. United States, 390 U.S. 377, 383-84 (1968)).

The first—"unnecessarily suggestive"—prong requires a determination of whether, upon consideration of the totality of the circumstances, the identification procedure was unnecessarily suggestive. See, e.g., Stovall v. Denno, 388 U.S. 293, 302 (1967); Fitzpatrick, 900 So. 2d at 517. The majority misstates the law in concluding that the first prong of the test for suppression is satisfied here based on

"the presence of a suggestive identification procedure." Majority op. at 9. The first prong of the test is only satisfied if the identification procedure is unnecessarily suggestive. See, e.g., Foster v. California, 394 U.S. 440, 442 (1969); Stovall, 388 U.S. at 302; Fitzpatrick, 900 So. 2d at 517.

In concluding that the first prong is met because "the identification procedure employed in this case was suggestive," majority op. at 9, the majority relies on State v. Sepulvado, 362 So. 2d 324, 326-27 (Fla. 2d DCA 1978). In Sepulvado, the Second District found "that the trial court could have properly concluded that the photo display was suggestive" because by giving the photos of Sepulvado and his two codefendants to the victim separately from the other 150 photos the victim was first asked to look at, "[t]he pictures of Sepulvado and his two codefendants were presented to the victim in such a way as to pointedly draw [his] attention to them," and when a more recent picture of Sepulvado was presented to the victim the next day in a "five-picture photo pack it augmented the suggestiveness of the previous identification procedure." 362 So. 2d at 327. Here, Walton's picture was not presented to Gillan separately from the other five photos in the set nor was it presented to her individually or in another photo set at a later time. Thus, Sepulvado is distinguishable and does not aid in the determination of whether the procedure in this case was unnecessarily suggestive.

In this case, the identification procedure was not unnecessarily suggestive. Detective Padgett did not at any point during the identification procedure suggest to Gillan that Walton was one of the suspects in this case. The majority incorrectly states that "Detective Padgett called Gillan's attention to the picture without her having given any indication that she recognized Walton." Majority op. at 9. But Gillan's reaction to seeing Walton's photo was an indication that she recognized him and it was not prompted by anything law enforcement did. Gillan acknowledged that she reacted in the manner Detective Padgett described because she recognized Walton as one of the men involved in the robbery and shooting, and although she initially told Detective Padgett she was "not sure," she later clarified that she did immediately recognize Walton as the man shooting at the detectives from the passenger side of the orange car. And instead of immediately pointing out Gillan's reaction and possibly suggesting that her reaction was to "the right guy," Detective Padgett let Gillan finish viewing the rest of the photos without interruption, and she had no reaction to any of the other photos. The manner in which Gillan was presented with the photo set was entirely proper. Walton's photo was not singled out by Detective Padgett until after he observed Gillan's reaction to it. And there was nothing improper about Detective Padgett's inquiry regarding the reaction to Walton's photo. In fact, Padgett would have been remiss had he observed the reaction and not followed up on it. Considering his twelve years of

experience as a detective in the robbery unit and his experience with witnesses who are hesitant to make identifications because they are afraid to face the suspect in court, fear for the safety of their families, or just do not want to get involved in a criminal prosecution, and his recognition of Gillan as one of those witnesses, Detective Padgett's inquiry was reasonable and necessary.

Although I conclude that there is no need to reach the second prong of the test for suppression of an out-of-court identification, see Fitzpatrick, 900 So. 2d at 518 ("If the procedures used by the police in obtaining the out-of-court identification were not unnecessarily suggestive, however, the court need not consider the second part of the test." (citing Rimmer, 852 So. 2d at 316)), I would note that the majority's analysis of this prong relies on several factual inaccuracies. The record does not support the majority's assertions that "Gillan provided very little detail of what she witnessed," that she had a "hazy memory of the incident," or that "[d]uring her interview, Gillan stated that one of the men had short dreadlocks." Majority op. at 10. Gillan was detailed in her description of what she observed during the shooting, the positions of the three black males, the color of the suspect vehicle, the color of Walton's gun, the order of events, the identity of the victims, and the manner in which the men fled the scene. And Gillan did not mention anything about dreadlocks in the portion of the interview in the record; the majority even recognizes that "[t]he record is unclear as to what exactly she told

law enforcement officers prior to identifying Walton." Majority op. at 11. The majority also states "that Gillan did not display a high level of certainty when she identified Walton" because she "initially said she was 'not sure' if she recognized anyone." Majority op. at 11. But Gillan stated both at the time she made the identification and during her deposition that she was "sure" Walton was the shooter kneeling by the orange car and she never wavered on that point. It is apparent from the record that Gillan only initially stated she was "not sure" because she was afraid that Walton would know she identified him. Contrary to the majority's assertion, Gillan did not "testif[y] at trial that she was unsure of her identification of Walton." Majority op. at 11. When asked whether the person she identified was the person she saw kneeling on the passenger side of the car shooting at the detective, she replied, "Yes, ma'am."

Finally, even if the identification procedure at issue was "impermissibly suggestive," I would conclude that any error in admitting Gillan's out-of-court identification was harmless beyond a reasonable doubt because there is no reasonable possibility that the error affected the verdict in light of the independent identification of Walton by another eyewitness and the DNA evidence connecting Walton to the getaway car.

POLSTON, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Certified Direct Conflict of Decisions

First District - Case No. 1D10-6776

(Duval County)

Nancy Ann Daniels, Public Defender, and Pamela Diane Presnell, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

for Petitioner

Pamela Jo Bondi, Attorney General, Trishia Meggs Pate, Bureau Chief, and Virginia Chester Harris, Assistant Attorney General, Tallahassee, Florida,

for Respondent